Certiorari Granted, August 26, 2015, No. 35,451

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:  2015-NMCA-094

Filing Date: June 30, 2015

Docket No. 33,249

STATE OF NEW MEXICO,

  Plaintiff-Appellee,

v.

PATRICIA GARCIA,

  Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF LUNA COUNTY
Daniel Viramontes, District Judge

Hector H. Balderas, Attorney General
Paula E. Ganz, Assistant Attorney General
Santa Fe, NM

for Appellee

McGraw & Strickland, LLC
Margaret Strickland
Las Cruces, NM

for Appellant

## OPINION

**GARCIA, Judge.**

**{1}** A jury found Defendant Patricia Garcia guilty of two second degree felonies, fraud, in violation of NMSA 1978, § 30-16-6(A), (F) (2006), and computer access with intent to defraud, in violation of NMSA 1978, § 30-45-3(E) (2006). On appeal, Defendant argues, among other things, that there was insufficient evidence presented to establish that the alleged victim, Page Kent, relied on her misrepresentations about her marital status. We

1

agree that this was a critical issue regarding the fraud allegations filed by the State. The State did not ask Mr. Kent to testify about the reliance element of the fraud charge during Mr. Kent's testimony at trial. Instead, it attempted to establish the element of reliance by inferences from the other evidence presented. We hold that the other evidence was insufficient to permit an inference establishing reliance beyond a reasonable doubt. As a result, we reverse both of Defendant's convictions.

**BACKGROUND**

**{2}**     The following facts relevant to the issue we address on appeal were adduced at trial. Defendant, a woman in her fifties, and Mr. Kent, a recently widowed man in his mid-eighties, first met at the post office around May 2010. At this first meeting, Defendant told Mr. Kent that she was not married and that she had been divorced several times. She asked Mr. Kent for $5,000 to "have her breast work raised[,]" and Mr. Kent wrote her a check for $5,000.

**{3}**     After this first meeting, Defendant and Mr. Kent "became friends." Defendant took Mr. Kent to his medical appointments and helped him with his personal finances. "After a while," Defendant asked Mr. Kent if she could use his bank account to help her pay for her "children's education[,]" "everyday things, . . . cars[,]" and to "help [her children's] way of life." Defendant told Mr. Kent that she would "replace what she took." Mr. Kent agreed, and Defendant began accessing and transferring money from Mr. Kent's accounts to her own account in October 2010.

**{4}**     On December 15, 2010, and January 4, 2011, Mr. Kent made Defendant a joint owner on his accounts. When the prosecutor asked Mr. Kent at trial "what caused" him to make Defendant a joint owner on his accounts, Mr. Kent replied that he did so because Defendant told him "it would be easier for her and her bookkeeping and also the contact with money and then she would replace it." On cross-examination, Mr. Kent also stated that he put Defendant on his accounts because he "wanted to help her out" with "her family, . . . her children, and . . . other things." A New Mexico Adult Protective Services Department caseworker who had interviewed Mr. Kent testified at trial that Mr. Kent told her that he allowed Defendant to use his accounts because "he felt sorry for [Defendant] and that he was helping her."

**{5}**     Mr. Kent allowed Defendant to use his accounts "as she needed[,]" and although he did not tell her she could use his money "carte blanche," he did not expressly limit her spending. Mr. Kent allowed Defendant to access his accounts over the computer.

**{6}**     On January 20, 2011—a few months after Defendant began using Mr. Kent's accounts and about one month after Mr. Kent made Defendant a joint owner on his accounts—Defendant married a man named Jerry Marquez, whom she divorced about a year later on February 12, 2012. Defendant never told Mr. Kent that she had gotten married, that she was romantically involved with anyone prior to this marriage, or that Mr. Marquez was

more than a "friend." Indeed, when Defendant arranged to have Mr. Marquez work on Mr. Kent's roof in May 2011, Defendant lied when she introduced Mr. Marquez to Mr. Kent as her "gay friend" because she was married to Mr. Marquez at that time. The prosecutor asked Mr. Kent at trial, "When you put [Defendant] on your accounts, did you know that you were putting a married woman on your bank accounts?" Mr. Kent replied, "It was impossible because I didn't know it."

**{7}**      In May 2011, representatives from Mr. Kent's bank and a caseworker from the New Mexico Adult Protective Services Department approached Mr. Kent about their concerns with Mr. Kent's dwindling bank accounts. Mr. Kent then stopped Defendant from accessing his accounts when he discovered that his "money was going down, down, down," and he wanted to "curtail the action" on his accounts. However, after Mr. Kent and Defendant "talked about it" and Defendant agreed to "slow down on it," Mr. Kent resumed allowing Defendant to access his accounts, but he did not make her a joint owner of his accounts again. Instead, in October 2011, Mr. Kent named Defendant the beneficiary of his accounts, which meant only that the money in Mr. Kent's accounts would have gone to Defendant upon Mr. Kent's death. Although Defendant's use of Mr. Kent's accounts "quieted down a little bit[,]" it eventually "went back to the same old way." The money in Mr. Kent's accounts "went down again" and Defendant "didn't respect it[.]"

**{8}**      Mr. Marquez testified that sometime in January 2012 he told Mr. Kent that he was married to Defendant and that Mr. Kent "was shocked." However, when the prosecutor asked Mr. Kent how he learned that Defendant was married, Mr. Kent replied, "Well, it wasn't [Mr. Marquez]." The last time that Defendant took money from Mr. Kent's accounts was on February 14, 2012. On February 18, 2012, Mr. Kent removed Defendant as the beneficiary of his accounts.

**{9}**      The prosecutor asked Mr. Kent at trial, "What caused you to finally take [Defendant] off your accounts permanently?" Mr. Kent replied, "The bank—they kept hounding me, 'You have problems Mr. Kent,' . . . and my money in the bank . . . was down." Mr. Kent also testified that after "the sheriff's representatives came out and talked" to him is "when things started with [his] degeneration of [his] . . . contact with [Defendant]." He said that he "ended up taking her name off of everything" because he "finally woke up to see what was really happening to [his] money," and that "after a while it got so bad . . . [he] had to stop it." When defense counsel asked Mr. Kent why, other than the first time he met Defendant, he did not ask Defendant any details about her personal romantic life over the course of their friendship, Mr. Kent replied that such details were "pertinent, very pertinent now, but I didn't even think of it 'cause she said she was not [married]."

**{10}**      On February 21, 2012, Mr. Kent filed a fraud complaint with his bank. At some point, Mr. Kent and a friend of his notified the police.

**{11}**      At trial, the prosecutor repeatedly asked Mr. Kent to elaborate on the nature of his relationship with Defendant and how Mr. Kent viewed this relationship. Mr. Kent repeatedly

replied that he and Defendant were friends, even though he admitted to having had a romantic interest in her that "meant more" than the interest that Defendant had in him:

[PROSECUTOR:]     After you met [Defendant], what type of things would you do together?

[MR. KENT:]     Oh my, let's see. We became friends and she . . . said, 'From now on I will take you to all the hospitals you have to go to or doctors,' and that was kinda the starter. And she did. And we just had a pleasant relationship.

. . . .

[PROSECUTOR:]     What else did you and her do? What other kind of activities?

[MR. KENT:]     Not much, really.

[PROSECUTOR:]     What would you talk about? What kinds of things would you and her talk about?

[MR. KENT:]     [Laughs]

[PROSECUTOR:]     What did you have in common? I guess that's a way of putting it. What did you and her have in common that you liked to talk about?

[MR. KENT:]     I guess, cars [laughs].

[PROSECUTOR:]     What was the friendship based upon? . . . What type of conversation would she have with you, Mr. Kent? What sort of subjects would she bring up and talk about with you?

[MR. KENT:]     I guess, after a year or so we kind of looked a little closer to ourselves and we just liked each other.

[PROSECUTOR:]     How did you come to think of [Defendant] after a time? You said you were friends, but after a while how did you come to think of her? What did you think of her in your mind as the relationship that you had with her after a while?

. . . .

[MR. KENT:]     It was nice. Pleasant.

[PROSECUTOR:]     Okay, but how would you describe her? What have

4

|  |  | you described her as in the past to people when you were . . . getting along with her quite well? How had you described her to other people? As your what? |
| --- | --- | --- |
| [MR. KENT:] | | I guess, my friend. And my [pauses]— |
| [PROSECUTOR:] | | Your what? |
| [MR. KENT:] | | My friend, and uh, how will I say it— |
| [PROSECUTOR:] | | What are you trying to say? |
| [MR. KENT:] | | I'm trying to say that she meant more to me than what I thought. |
| [PROSECUTOR:] | | When you say meant more to you though, in what regard? Meant more to you in what way? 'Cause we have friends, you know, I mean, some people I might just consider a friend, like an acquaintance or someone that I might just see on the street and talk to. Is that all that it was with [Defendant] in your mind? |
| [MR. KENT:] | | No. |
| . . . . | | |
| [PROSECUTOR:] | | So, Mr. Kent, let me be just very blunt. Did you have a romantic interest in [Defendant] at some point? |
| [MR. KENT:] | | Yes. |
| [PROSECUTOR:] | | So then in some ways you told people that you regarded her as what to you? |
| [MR. KENT:] | | As my close friend, and I wouldn't say quite a lover 'cause I'm eighty-six, eighty-seven years old. But it was very nice and also . . . we were both content. |

Although Mr. Kent did not testify that he thought of Defendant as his romantic partner, the caseworker testified that Defendant knew that Mr. Kent thought of Defendant as his "girlfriend."

{12}    The prosecutor did not ask Mr. Kent any questions about whether he relied on his impression that Defendant was not dating or married to anyone during the time that he allowed Defendant access to his bank accounts. The prosecutor did not ask Mr. Kent if he gave Defendant access to his accounts because he thought of her as his romantic partner. Furthermore, on cross-examination, when defense counsel asked Mr. Kent whether he had been "tricked" into giving Defendant access to his account, Mr. Kent replied that he had not:

| [DEFENSE COUNSEL:] | | You . . . granted [Defendant] access to that account, right? |
| --- | --- | --- |

5

| [MR. KENT:] | Yes. |
| --- | --- |
| [DEFENSE COUNSEL:] | Nobody tricked you, nobody did anything to try and take advantage of you. . . . You did it freely and willingly, correct? |
| [MR. KENT:] | Right. |

**{13}**    In his closing argument, the prosecutor asserted:

> [I]t's hard for [Mr. Kent] to come out and say he thought that [Defendant] . . . was his girlfriend, but that's what he thought about her, that's how he thought of her, and she encouraged it. . . . by lying to Mr. Kent about who her husband was. . . . [and] she didn't think that way about him.[1]

## DISCUSSION

**{14}**    The narrow question we must answer in this appeal is whether there was sufficient evidence presented to establish beyond a reasonable doubt that Mr. Kent relied on Defendant's deception about her relationship and marriage status when he allowed Defendant to use his money and access his accounts. For reasons we explain below, we conclude that the evidence was insufficient.

## A.    Elements of Criminal Fraud

**{15}**    The crime of "[f]raud consists of the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations." Section 30-16-6(A). A misrepresentation for purposes of criminal fraud may include a deceptive silence or omission. *See State v. Stettheimer*, 1980-NMCA-023, ¶¶ 9-14, 94 N.M. 149, 607 P.2d 1167. As contained within our uniform jury instructions and the jury instructions used in this trial, the state must also present evidence sufficient to prove that "[*b*]*ecause* of the . . . victim['s] reliance on [the misrepresentation], the] defendant obtained [a thing of value]." UJI 14-1640 NMRA (emphasis added).

**{16}**    A critical inquiry in this appeal is what constitutes reliance. Although the jury in this

---

[1]The prosecutor also asserted in his closing argument that Defendant's asking Mr. Kent for $5,000 for breast surgery upon their first meeting in May 2010, and then not having the surgery, was the first instance of fraud. However, the jury instructions and Defendant's resultant conviction covered conduct occurring only between the dates of October 10, 2010, and February 13, 2012. We assume this is why the State did not raise this issue in its answer brief. The State confirmed at oral argument that Defendant's May 2010 conduct should not be considered in upholding her fraud conviction.

6

case was not instructed about how to determine whether Mr. Kent's reliance on Defendant's misrepresentation *caused* Mr. Kent to allow Defendant to access his accounts, we find it helpful to refer to UJI 14-134 NMRA in interpreting the legal requirements under which the element of reliance must be proved in a criminal trial for fraud. Although not used in this trial, UJI 14-134 is a criminal uniform jury instruction that "*should* be used in cases [other than homicide] in which causation is an issue." UJI 14-134 n.1 (emphasis added). UJI 14-134 provides, in pertinent part:

> In addition to the other elements of the crime . . . , the state must also prove . . . beyond a reasonable doubt that[] . . . [t]he act of the defendant was a significant cause of the injury or harm. The defendant's act was a significant cause of the injury or harm if it was an act which, in a natural and continuous chain of events, uninterrupted by an outside event, resulted in the injury or harm *and without which the injury or harm would not have occurred*. (Emphasis added.)

Thus, to sustain a fraud conviction, we conclude that the State must prove beyond a reasonable doubt that *without* the defendant's misrepresentation, the defendant would not have obtained the thing of value. *Id.*; *accord State v. Young*, 1998 ME 107, ¶ 14, 711 A.2d 134, 137 (referring to the Maine Criminal Code's definition of causation in determining the nature of the causal relationship that must be proved in a theft by deception prosecution and framing the issue as whether the defendant "would not have obtained the money *but for* his deceptive act"); 3 Charles E. Torcia, *Wharton's Criminal Law* § 427 (15th ed. 1995) (stating that, in proving a defendant obtained money or property by false pretenses, it is not "necessary . . . that the false representation be the paramount cause for the victim's surrender of his property; it is sufficient merely that the false representation be a cause *without which* the victim would not have surrendered his property" (emphasis added)).

## B.      Standard of Review and General Principles

**{17}** In conducting a sufficiency-of-the-evidence analysis, we review the evidence in the light most favorable to the verdict "to determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to [the] conviction." *State v. Hornbeck*, 2008-NMCA-039, ¶ 33, 143 N.M. 562, 178 P.3d 847 (internal quotation marks and citation omitted). "We do not re-weigh the evidence or substitute our judgment for that of the fact-finder, so long as sufficient evidence supports the verdict." *Id.* We remain mindful, however, that "evidence that is sufficient to allow a rational juror to make a finding adverse to a defendant under a lesser preponderance-of-the-evidence standard [of proof] will not necessarily suffice to allow a rational factfinder to reach the subjective state of certitude required by the beyond-a-reasonable-doubt standard." *State v. Garcia*, 2004-NMCA-066, ¶ 9, 135 N.M. 595, 92 P.3d 41, *rev'd in part on other grounds by State v. Garcia*, 2005-NMSC-017, 138 N.M. 1, 116 P.3d 72. "[E]vidence equally consistent with two inferences does not, without more, provide a basis for adopting either one—especially beyond a reasonable doubt." *Garcia*, 2005-

7

NMSC-017, ¶ 12 (internal quotation marks and citation omitted); *see also Baca v. Bueno Foods*, 1988-NMCA-112, ¶ 15, 108 N.M. 98, 766 P.2d 1332 ("Evidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition.").

{18}    "Although appellate courts are highly deferential to a jury's decisions, it is the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Slade*, 2014-NMCA-088, ¶ 14, 331 P.3d 930 (internal quotation marks and citation omitted). In *State v. Maes*, this Court found the Second Circuit's discussion in *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir. 1997) helpful in discerning the fine line that sometimes exists between permissible inference and impermissible speculation:

> The line between permissible inference and impermissible speculation is not always easy to discern. When we 'infer,' we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is 'reasonable.' But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it 'speculation.' When that point is reached is, frankly, a matter of judgment.

*State v. Maes*, 2007-NMCA-089, ¶ 18, 142 N.M. 276, 164 P.3d 975 (quoting *Goldhirsh Grp., Inc.,* 107 F.3d at 108).

**D.    Analysis**

**1.    Timing of Defendant's Deception and Mr. Kent's Decision to Allow Her Access to His Accounts**

{19}    We begin our analysis by noting that at the time that Mr. Kent began allowing Defendant to access his accounts for her own purposes in October 2010 and at the time he made her a joint owner on his accounts on December 15, 2010, and January 4, 2011, Defendant was not married. The evidence shows that Defendant married Mr. Marquez on January 20, 2011. Although Mr. Marquez testified that prior to his marriage with Defendant, he and Defendant "cohabitat[ed] . . . off and on[,]" his testimony does not establish when their relationship began or whether it was exclusive or continuous prior to their marriage.[2]

---

[2]Our review of the trial testimony belies the State's assertion in its answer brief that "Defendant was living at . . . [Marquez]'s house" at the time that she met Mr. Kent. To the contrary, Mr. Marquez testified that prior to their marriage, he and Defendant "cohabitat[ed]

8

Thus, the evidence adduced at trial did not show that Defendant had deceived Mr. Kent in any way at the time that Mr. Kent decided to allow Defendant access to his accounts and to make her a joint owner of his accounts. Thus, the point that the State raised at trial and again raises in its answer brief—that Mr. Kent "did not know he was putting a married woman on his accounts"—is not persuasive because it is based on the assumption of a fact that was actually disproved by the evidence at trial.

**{20}** Defendant's deceptive behavior becomes sufficiently apparent, however, when she married and moved in with Mr. Marquez in January 2011 and not only failed to tell Mr. Kent this significant detail about her personal life during the "couple times a week" they spent together, but blatantly lied to Mr. Kent when she introduced Mr. Marquez to him as her gay friend in May 2011. Regardless of whether Defendant's deception established her intent to defraud Mr. Kent when she hid the fact that she was married to Mr. Marquez, the issue on appeal is not what Defendant intended, but rather what Mr. Kent himself relied upon when he allowed her to use his accounts.

## 2. Insufficient Evidence of Reliance

**{21}** During the State's examination of Mr. Kent at trial, the prosecutor did not ask Mr. Kent whether he would have allowed Defendant to continue to access his accounts if he knew that Defendant was involved with and had eventually married Mr. Marquez. Instead, when the prosecutor asked Mr. Kent "what caused" him to allow Defendant to access his money and make Defendant a joint owner on his accounts, he replied, "[i]t would be easier for her and her bookkeeping and also the contact with money and then she would replace it." On cross-examination, Mr. Kent also testified that he put Defendant on his accounts because he "wanted to help her out" with "her family, . . . her children, and . . . other things." He told the caseworker that he allowed Defendant to access his accounts because "he felt sorry for [Defendant] and that he was helping her." Mr. Kent testified that, beyond their first meeting, the status of Defendant's romantic affairs was not "pertinent" to him until "now." And when asked whether he felt he was "tricked" into allowing Defendant to use his bank accounts, Mr. Kent replied that he did not. This testimony is not sufficient to prove that Mr. Kent would not have given Defendant access to his accounts *but for* his impression that she was romantically available to him. *See* UJI 14-134; *Young*, 711 A.2d at 14; Torcia, *supra*, § 427.

**{22}** Although Mr. Kent was "shocked" when he discovered that Defendant had been married to Mr. Marquez, the evidence at trial was also insufficient to directly connect Mr. Kent's discovery of this fact with his decision to finally cut Defendant off from his accounts.

---

. . . off and on." After he and Defendant married in January 2011, Mr. Marquez "moved into the mobile home with her[.]" Later, Mr. Marquez bought a home and he and Defendant moved there. Mr. Marquez stated that Defendant began "developing" her relationship with Mr. Kent while she was living at [his] home. He did not testify that he and Defendant were living together when Defendant and Mr. Kent met.

The prosecutor did not ask Mr. Kent whether learning of Defendant's marriage prompted him to stop her from using his accounts. Instead, the evidence showed that Mr. Kent finally cut Defendant off from accessing his accounts for several other reasons: "[t]he bank . . . kept hounding [him]," his "money in the bank . . . was down[,]" he "finally woke up to see what was really happening to [his] money," and that "after a while it got so bad . . . [he] had to stop it." Mr. Kent testified that "[his] degeneration of [his] . . . contact with [Defendant,]" began when "the sheriff's representatives came out and talked" to him—he did not testify that learning of Defendant's marriage from Mr. Marquez caused him to take action or was the reason he ended his relationship with her. Furthermore, there was no evidence that Mr. Kent cut off Defendant's access to his accounts prior to her last transaction on February 14, 2012, which was at least two weeks after Mr. Marquez stated he told Mr. Kent about his marriage to Defendant in January 2012.

**{23}** Without testimony from Mr. Kent regarding what he relied upon and whether he would have continued to allow Defendant to access his accounts had he known her true marital status, the remainder of the evidence presented at trial would, at best, be equally consistent with two hypotheses on the factual element of reliance. *See Garcia*, 2005-NMSC-017, ¶ 12; *Baca*, 1988-NMCA-112, ¶ 15. One that, irrespective of Defendant's marital status, Mr. Kent's own testimony appears to support the position that he would have allowed Defendant to access his money to assist with her children's financial needs because they were close friends, he felt sorry for her, and because she provided him with assistance and companionship. The second being that, irrespective of Defendant's assistance and companionship, Mr. Kent only allowed Defendant to access his accounts because of he thought of her as his romantic partner.

**{24}** Mr. Kent was the State's primary witness and testified at length in this case. Evidence of Mr. Kent's reliance on Defendant's misrepresentation of her marital status was not the type of evidence that was clandestine in nature, could only be proved by circumstantial evidence, and therefore required the jury to disregard Mr. Kent's testimony and extract contradictory inferences from other indirect testimony. *Cf. State v. Gallegos*, 2011-NMSC-027, ¶ 45, 149 N.M. 704, 254 P.3d 655 (recognizing that because conspiracies are clandestine in nature, establishing evidence of an agreement between the conspirators is seldom available, the jury may infer such an agreement from the parties' conduct and the surrounding circumstances, even though it raises the specter of a conviction by guess and speculation). The State offers no explanation for its failure to ask Mr. Kent about what he relied upon when he gave Defendant money and allowed her access to his accounts. Even if the jury could also infer that, had the victim known the truth about Defendant's marital status, he *possibly* would not have given Defendant money or access to his accounts, we conclude that, based upon the evidence presented, the jury could not reasonably make such a circumstantial inference *beyond a reasonable doubt*. *See Garcia*, 2004-NMCA-066, ¶¶ 9, 11; *Slade*, 2014-NMCA-088, ¶ 14; *cf. Commw. v. Imes*, 623 A.2d 859, 863 (Pa. Super. Ct. 1993) (concluding that the government failed to prove the element of reliance on a false impression where "none of the [purported victims] were called to testify at the trial[,]" and "[c]onsequently, none of them could state whether they relied on [the] false impression").

The State failed to establish such a basis of reliance when Mr. Kent competently testified at trial. Asking the jury to determine the victim's reliance from these two plausible inferences presented by the State, without asking the victim about the matter during his trial testimony, was the type of evidentiary guesswork and speculation that is insufficient for the State to meet its burden of proof. *See Slade*, 2014-NMCA-088, ¶ 14.

**{25}** Therefore, because the State carried the burden to prove beyond a reasonable doubt that "without" Defendant's misrepresentation about her marital status, Mr. Kent would not have allowed her to access his accounts, the other indirect and contradictory circumstantial evidence was insufficient to infer the element of reliance necessary to sustain Defendant's fraud conviction. UJI 14-134 (providing that, in criminal trials in which causation is an issue, the state must prove that "without" the defendant's act, "the injury or harm would not have occurred"); *see Young*, 711 A.2d at 14; Torcia, *supra*, § 427; *see also Hornbeck*, 2008-NMCA-039, ¶ 33 (providing that substantial evidence must support every element essential to the conviction). On the record before us in this case, we hold that "the link between the facts and the conclusion" is "so tenuous that we call it 'speculation.' " *Maes*, 2007-NMCA-089, ¶ 18 (internal quotation marks and citation omitted).

**{26}** We note that what makes Defendant's conduct troubling is the age and vulnerability of Mr. Kent. He was in his mid-eighties, just lost his wife of thirty-six years, and needed someone to take him to his medical appointments and provide personal companionship. Although Defendant helped Mr. Kent in these ways, she also used his vulnerability to benefit herself in an amount that appeared somewhat disproportionate. Rather than ask Mr. Kent to testify about whether he relied upon Defendant's marital status to allow her to access his accounts, the State asked the jury to infer such reliance based upon other indirect and contradictory circumstantial evidence. We cannot speculate as to why the State presented its case in this manner. This was either a tactical trial decision by the prosecutor or an inadvertent error. Unfortunately, the other indirect circumstantial evidence was insufficient to establish the element of reliance beyond a reasonable doubt.

**E.     Computer Access with Intent to Defraud**

**{27}** We also conclude that there was insufficient evidence to support Defendant's conviction of computer access with intent to defraud. Our Supreme Court has concluded that "the Computer Crimes Act was intended by the [L]egislature to deter and punish crimes committed, at least in a manner of speaking, against computers, or through the abuse of computer sophistication." *State v. Rowell*, 1995-NMSC-079, ¶ 12, 121 N.M. 111, 908 P.2d 1379. The Court noted that the Senate bill upon which the Act was based stated that "[t]he [L]egislature recognizes a dramatic increase in computer-related crimes . . . through the introduction of fraudulent data into a computer system, the unauthorized use of computer facilities, the alteration or destruction of computerized information or files[,] and the stealing of financial information, data [or] other assets." *Id.* ¶ 12 n.2. It observed that the Act was not intended to apply to the use of a computer as "a passive conduit through which the defendant's criminal activity passed." *Id.* ¶ 11.

11

**{28}** In this case, Defendant did not introduce "fraudulent data into a computer system," use "computer facilities" without "[authorization,] . . . alter[] or [destroy] . . . computerized information or files[,]" nor did she steal "financial information, data [or] other assets." *Id.* ¶ 12 n.2. Instead, Defendant used the computer as "a passive conduit" to access accounts and transfer funds, just as any banking customer would. *Id.* ¶ 11.

**{29}** Furthermore, because we have concluded that the evidence was insufficient to prove that the underlying transfers made via the computer were criminal, and because Mr. Kent expressly approved Defendant's use of a computer to perform these transfers, the elements of computer access with intent to defraud could not be proved beyond a reasonable doubt.

**CONCLUSION**

**{30}** Because we reverse Defendant's convictions and remand the case to the district court with instructions to vacate Defendant's convictions, we need not address the other issues that Defendant raises on appeal.

**{31}    IT IS SO ORDERED.**

_____
**TIMOTHY L. GARCIA, Judge**

**I CONCUR:**

_____
**M. MONICA ZAMORA, Judge**

**JONATHAN B. SUTIN, Judge (dissenting).**

**SUTIN, Judge (dissenting).**

**{32}** I acknowledge that one might question whether the peculiar and particular circumstances in this case should be covered under the criminal fraud statute. Why not leave it to civil fraud remedies? Why not, as Defendant strongly argued in her briefing and in oral argument, exclude deception in romantic relationships from criminal prosecution? Further, why not fall back on a view that the circumstances showed it only more likely than not that Mr. Kent relied on Defendant's conduct, deceitful hiding of material information, and fraudulent misrepresentations and omissions? I am unable to follow these why-not paths. Therefore, I respectfully dissent and would affirm.

**{33}** Looking at the totality of circumstances, particularly including Defendant's conduct, practices, and misrepresentations (including omissions), it seems apparent that the jury strongly believed that Defendant engaged in a deliberate, willful fraudulent scheme to have access to Mr. Kent's bank accounts. And the district court must have viewed the

12

circumstances in a similar fashion, having imposed consecutive nine-year sentences for the two convictions for a total of eighteen years, ten of which were suspended, and having denied Defendant's motion for a restitution hearing and imposing restitution in the amount of $53,800.

**{34}** Further, viewed in the light most favorable to the verdict, as we must, the evidence presented at trial should be considered sufficient to support Defendant's convictions, including the element of reliance. *State v. Nichols*, 2014-NMCA-040, ¶ 15, 321 P.3d 937 (stating that in our review of sufficiency-of-the evidence claims, we view the evidence in the light most favorable to the guilty verdict). I would affirm.

**{35}** The jury was instructed, in relevant part, that to find Defendant guilty of fraud, the State was required to prove that (1) Defendant, "by any words or conduct, misrepresented a fact to [Mr.] Kent, intending to deceive or cheat" him; and (2) "[b]ecause of the misrepresentation and [Mr.] Kent's reliance on it, [D]efendant obtained over $20,000[.]" This instruction is the law of the case against which the sufficiency of the evidence supporting the jury's verdict of guilty of fraud beyond a reasonable doubt is to be measured. *See State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of evidence is to be measured.").

**{36}** Mr. Kent inquired into Defendant's marital status upon their first meeting in May 2010. Although at that time Defendant was apparently living with her boyfriend, Mr. Marquez, whom she married in January 2011, Defendant told Mr. Kent at the time only that she was not married, but that she had previously been married.

**{37}** Within several months following that meeting, Defendant persuaded Mr. Kent to allow her access to his bank accounts, and one month before she married Mr. Marquez, Defendant persuaded Mr. Kent to add her as a co-owner of his bank accounts and to use the accounts to help Defendant with her children's education and her "problems."

**{38}** Mr. Kent testified that he and Defendant started a friendship when Defendant offered to take and then began taking Mr. Kent to doctors and to hospitals. According to Mr. Kent, after a year or so, he and Defendant "liked each other." "After a while," Mr. Kent regarded Defendant as a close friend, not "quite a lover," but someone in whom he had a romantic interest; and, as Mr. Kent described it, they "were both content."

**{39}** Beginning in October 2010, before Mr. Kent added Defendant as a co-owner of his bank accounts in December 2010, Defendant transferred money from one of Mr. Kent's accounts into her own accounts using the online-transfer banking feature available through Mr. Kent's bank. Defendant continued to transfer money from Mr. Kent's accounts into her own account through mid-February 2012. Mr. Kent had given Defendant permission to effect transfers and withdrawals from his accounts, and he did not specify a limit nor did he require a specific account of what the money was to be used for. Mr. Kent also gave Defendant permission to use his debit card, and she did so. At times, Defendant paid Mr. Kent back at

least some of the money that she had taken from his accounts. Mr. Kent did not know how much Defendant had paid back.

**{40}** Defendant never told Mr. Kent that she had married Mr. Marquez; in fact, she introduced Mr. Marquez, her then-husband, to Mr. Kent in May 2011 and told Mr. Kent that Mr. Marquez was her "gay friend." In January 2012, Mr. Marquez went to Mr. Kent's home to tell him that he and Defendant were married; according to Mr. Marquez, Mr. Kent "was shocked" by that information. In February 2012, Mr. Kent permanently removed Defendant from his accounts. Three days later, Mr. Kent filed an "affidavit of online fraud" with his bank.

**{41}** Given that the affidavit was admitted at trial as an exhibit, this Court sua sponte obtained a copy. The subject of the affidavit of online fraud was a series of enumerated transactions achieved by "unauthorized ATM activity[,] unauthorized branch withdrawal and deposit activity[, and] unauthorized teletransfer activity" totaling several thousand dollars that occurred between September 2011 and February 2012. In handwritten responses to the questionnaire portion of the affidavit of online fraud, Mr. Kent provided the following relevant answers. In response to the question "[w]hen and how did you discover the fraud in your account?" Mr. Kent answered that "[a]round [the] 9th of February 2012, secondary acct holder's ex-husband . . . informed me of some suspicious activity." In response to the question "[d]o you know who might have committed the fraud?" Mr. Kent responded, "Yes– Patricia G. Garcia. 'Girlfriend'[.]" And, in response to the questionnaire's request to "[e]xplain how the person that committed the fraud might have gained access to your account information[,]" Mr. Kent wrote, "manipulated, convinced me to trust her . . . [.]"

**{42}** These facts, among others in the record, must be viewed by us within the context of the evidence as a whole and considered within the totality of the circumstances while indulging all reasonable inferences in favor of the jury's verdict of guilt beyond a reasonable doubt. *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285; *see Gallegos*, 2011-NMSC-027, ¶ 18 (rejecting a "divide-and-conquer" approach to considering the sufficiency of the evidence "whereby each piece of evidence is viewed in isolation, ignoring reasonable inferences from the totality of the circumstances that support guilt" (internal quotation marks omitted)). "When we infer, we derive a conclusion from proven facts because such considerations as experience, or history . . . have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable." *Maes*, 2007-NMCA-089, ¶ 18 (internal quotation marks and citation omitted).

**{43}** By applying the appropriate standards of review to the jury's decision, the jury could have reasonably inferred that, by asking Defendant at the outset of their relationship whether she was married, the mid-eighty-year-old victim, whose wife had recently died, intended to learn whether Defendant was available to engage in a romantic relationship. Defendant's response that she was not married, while technically correct, could reasonably have been considered by the jury as disingenuous given that she was living with her boyfriend, Mr.

Marquez, whom she married months later. The jury could also have reasonably inferred that Defendant intended to deceitfully present herself as romantically unattached. *See Stettheimer*, 1980-NMCA-023, ¶ 13 (stating that silence that is calculated to deceive may form the basis for a criminal misrepresentation). In addition, based on Defendant's almost immediate and continuing pursuit of Mr. Kent's money, the jury could have reasonably inferred that Defendant's conduct was purposeful in order to eventually gain access to Mr. Kent's money, an inference that is supported by the fact that within months of their first meeting, Defendant had direct access to Mr. Kent's bank accounts. *State v. Brenn*, 2005-NMCA-121, ¶ 24, 138 N.M. 451, 121 P.3d 1050 (recognizing that "intent is usually inferred from the facts of the case" and established by circumstantial, not direct, evidence).

**{44}** Further, the jury could have reasonably inferred that Defendant understood that Mr. Kent's willingness to allow her access to his accounts was grounded in Mr. Kent's impression that Defendant was his "girlfriend," and in addition, that Defendant's conduct showed an intent to continue her ruse so as to continue using Mr. Kent's money, an inference that was supported by Defendant having never informed Mr. Kent of her pre-marriage relationship with and her marriage to Mr. Marquez and by her affirmative misrepresentation when introducing Mr. Marquez as her gay friend. Finally, based on the overall circumstances and on Mr. Kent's affidavit of online fraud stating that Defendant gained access to his bank accounts by having "manipulated" and "convinced [him] to trust her[.]" This, combined with the use of the term "girlfriend," in quotation marks and underlined, allowed the jury to reasonably infer that but for Defendant's deceitful conduct intended to lead Mr. Kent to believe that she was romantically unattached, unmarried, and was his girlfriend, he would not have permitted Defendant to access his bank accounts. This inference is further supported by the fact that, although Mr. Kent always knew that Defendant was accessing his bank accounts and using his money, he stated that he did not discover the fraud on his account until Mr. Marquez informed him in February 2012 of "some suspicious activity." From Mr. Marquez's testimony, the jury could infer that the "suspicious activity" to which Mr. Kent referred included that Mr. Marquez was not Defendant's gay friend but was, instead, her husband. Viewed in the context of the evidence as a whole, the jury could reasonably have concluded that but for the knowledge that Defendant's "activity" was "suspicious" from which Mr. Kent could believe that Defendant's intent and activity was to defraud him, Mr. Kent would not have considered Defendant's use of his bank accounts to be fraud.

**{45}** To hold that the evidence in this case was insufficient to prove Mr. Kent's reliance on Defendant's fraudulent conduct, misrepresentations, and omissions sweeps aside reasonable inferences formed by the jury in reaching its verdict. *See Slade*, 2014-NMCA-088, ¶ 13 (noting that "the weight and effect of the evidence, including all reasonable inferences to be drawn from both the direct and circumstantial evidence is a matter reserved for determination by the [jury]" and recognizing that this Court should not substitute its judgment for that of the jury (internal quotation marks and citation omitted)). Although "[t]he line between permissible inference and impermissible speculation is not always easy to discern[,]" *see Maes*, 2007-NMCA-089, ¶ 18 (internal quotation marks and citation

omitted), the jury's verdict in this case was supported by evidence and by permissible inferences drawn from that evidence, and it should be upheld. *See Slade*, 2014-NMCA-088, ¶ 14 (recognizing that an inference is a logical deduction from proven facts).

**{46}** The notion that evidence of reliance was insufficient because Mr. Kent never explicitly testified that he relied upon Defendant's conduct and statements relating to her marital status or her relationships with Mr. Marquez in allowing Defendant access to and partial ownership of his accounts is a theory that originated on appeal. Having heard the prosecution's direct and re-direct examination of Mr. Kent, and having himself cross-examined Mr. Kent, Defendant's trial counsel did not once raise or argue the fact that Mr. Kent had not explicitly testified that he relied on Defendant's continuing purposeful failure to reveal her relationship with Mr. Marquez and marriage to him in allowing Defendant to access his bank accounts.

**{47}** This, notwithstanding the fact that after the prosecution presented its case, Defendant's counsel moved for a directed verdict on grounds having nothing to do with a failure of evidence on reliance. *See State v. Barreras*, 2007-NMCA-067, ¶ 3, 141 N.M. 653, 159 P.3d 1138 ("The question presented by a directed verdict motion is whether there was substantial evidence to support the charge." (internal quotation marks and citation omitted)). It seems safe to assume that Defendant's trial counsel inferred, as did the jury, that based under the totality of the circumstances, including in particular Defendant's conduct and material misrepresentations and omissions, and the content of Mr. Kent's affidavit of online fraud identifying Defendant's marriage to Mr. Marquez as the basis for his claim, that the element of reliance was proved.

**{48}** A good part of Defendant's argument on appeal dwelled on a view that the criminal fraud statute and any reasonableness standard cannot be applied to romantic, fleeting, and fickle relationships, in that persons in such relationships can be, and often are, deceitful and unreasonable. To bring these relationships under the criminal fraud statute, Defendant argues, opens a dangerous prosecution door of criminal liability not contemplated by or intended to be covered under the criminal fraud statute. The Majority Opinion does not address this policy argument. This argument might have legs in the Legislature, but it has none in this case.

**{49}** Because the mainstay of the Majority Opinion is that reliance was not proved because Mr. Kent did not explicitly say that he relied on Defendant's misrepresentations, I have limited this dissent to that question. I have not dissected Defendant's arguments relating to materiality, privacy, free speech, double jeopardy, and due process. Those issues need be addressed only if this case happens to return to this Court after certiorari review by our Supreme Court. In sum, the element of reliance required to prove fraud rested upon a combination of proven facts and permissible inferences, with each inference reasonably derived from evidence at trial. Accordingly, viewing the evidence and inferences in a light most favorable to the verdict, I would uphold the jury's verdict and affirm Defendant's convictions.

16

_____
**JONATHAN B. SUTIN, Judge**