OPINION GARCIA, Judge. {1} A jury found Defendant Patricia Garcia guilty of two second degree felonies, fraud, in violation of NMSA 1978, § 30-16-6(A), (F) (2006), and computer access with intent to defraud, in violation of NMSA 1978, § 30-45-3(E) (2006). On appeal, Defendant argues, among other things, that there was insufficient evidence presented to establish that the alleged victim, Page Kent, relied on her misrepresentations about her marital status. We agree that this was a critical issue regarding the fraud allegations filed by the State. The State did not ask Mr. Kent to testify about the reliance element of the fraud charge during Mr. Kent’s testimony at trial. Instead, it attempted to establish the element of reliance by inferences from the other evidence presented. We hold that the other evidence was insufficient to permit an inference establishing reliance beyond a reasonable doubt. As a result, we reverse both of Defendant’s convictions. BACKGROUND {2} The following facts relevant to the issue we address on appeal were adduced at trial. Defendant, a woman in her fifties, and Mr. Kent, a recently widowed man in his mid-eighties, first met at the post office around May 2010. At this first meeting, Defendant told Mr. Kent that she was not married and that she had been divorced several times. She asked Mr. Kent for $5,000 to “have her breast work raised[,]” and Mr. Kent wrote her a check for $5,000. {3} After this first meeting, Defendant and Mr. Kent “became friends.” Defendant took Mr. Kent to his medical appointments and helped him with his personal finances. “After a while,” Defendant asked Mr. Kent if she could use his bank account to help her pay for her “children’s education[,]” “everyday things, . . . cars[,]” and to “help [her children’s] way of life.” Defendant told Mr. Kent that she would “replace what she took.” Mr. Kent agreed, and Defendant began accessing and transferring money from Mr. Kent’s accounts to her own account in October 2010. {4} On December 15, 2010, and January 4, 2011, Mr. Kent made Defendant a joint owner on his accounts. When the prosecutor asked Mr. Kent at trial “what caused” him to make Defendant a joint owner on his accounts, Mr. Kent replied that he did so because Defendant told him “it would be easier for her and her bookkeeping and also the contact with money and then she would replace it.” On cross-examination, Mr. Kent also stated that he put Defendant on his accounts because he “wanted to help her out” with “her family, . . . her children, and . . . other things.” A New Mexico Adult Protective Services Department caseworker who had interviewed Mr. Kent testified at trial that Mr. Kent told her that he allowed Defendant to use his accounts because “he felt sorry for [Defendant] and that he was helping her.” {5} Mr. Kent allowed Defendant to use his accounts “as she neededf,]” and although he did not tell her she could use his money “carte blanche,” he did not expressly limit her spending. Mr. Kent allowed Defendant to access his accounts over the computer. {6} On January 20,2011 — a few months after Defendant began using Mr. Kent’s accounts and about one month after Mr. Kent made Defendant a joint owner on his accounts — Defendant married a man named Jerry Marquez, whom she divorced about a year later on February 12, 2012. Defendant never told Mr. Kent that she had gotten married, that she was romantically involved with anyone prior to this marriage, or that Mr. Marquez was more than a “friend.” Indeed, when Defendant arranged to have Mr. Marquez work on Mr. Kent’s roof in May 2011, Defendant lied when she introduced Mr. Marquez to Mr. Kent as her “gay friend” because she was married to Mr. Marquez at that time. The prosecutor asked Mr. Kent at trial, “When you put [Defendant] on your accounts, did you know that you were putting a married woman on your bank accounts?” Mr. Kent replied, “It was impossible because I didn’t know it.” {7} In May 2011, representatives from Mr. Kent’s bank and a caseworker from the New Mexico Adult Protective Services Department approached Mr. Kent about their concerns with Mr. Kent’s dwindling bank accounts. Mr. Kent then stopped Defendant from accessing his accounts when he discovered that his “money was going down, down, down,” and he wanted to “curtail the action” on his accounts. However, after Mr. Kent and Defendant “talked about it” and Defendant agreed to “slow down on it,” Mr. Kent resumed allowing Defendant to access his accounts, but he did not make her a joint owner of his accounts again. Instead, in October 2011, Mr. Kentnamed Defendant the beneficiary of his accounts, which meant only that the money in Mr. Kent’s accounts would have gone to Defendant upon Mr. Kent’s death. Although Defendant’s use of Mr. Kent’s accounts “quieted down a little bit[,]” it eventually “went back to the same old way.” The money in Mr. Kent’s accounts “went down again” and Defendant “didn’t respect it[.]” {8} Mr. Marquez testified that sometime in January 2012 he told Mr. Kent that he was married to Defendant and that Mr. Kent “was shocked.” However, when the prosecutor asked Mr. Kent how he learned that Defendant was married, Mr. Kent replied, “Well, it wasn’t [Mr. Marquez].” The last time that Defendant took money from Mr. Kent’s accounts was on February 14, 2012. On February 18, 2012, Mr. Kent removed Defendant as the beneficiary of his accounts. {9} The prosecutor asked Mr. Kent at trial, “What caused you to finally take [Defendant] off your accounts permanently?” Mr. Kent replied, “The bank — they kept hounding me, ‘You have problems Mr. Kent,’ . . . and my money in the bank . . . was down.” Mr. Kent also testified that after “the sheriffs representatives came out and talked” to him is “when things started with [his] degeneration of [his] . . . contact with [Defendant].” He said that he “ended up taking her name off of everything” because he “finally woke up to see what was really happening to [his] money,” and that “after a while it got so bad . . . [he] had to stop it.” When defense counsel asked Mr. Kent why, other than the first time he met Defendant, he did not ask Defendant any details about her personal romantic life over the course of their friendship, Mr. Kent replied that such details were “pertinent, very pertinent now, but I didn’t even think of it ‘cause she said she was not [married].” {10} On February 21,2012, Mr. Kent filed a fraud complaint with his bank. At some point, Mr. Kent and a friend of his notified the police. {11} At trial, the prosecutor repeatedly asked Mr. Kent to elaborate on the nature of his relationship with Defendant and how Mr. Kent viewed this relationship. Mr. Kent repeatedly replied that he and Defendant were friends, even though he admitted to having had a romantic interest in her that “meant more” than the interest that Defendant had in him: [PROSECUTOR:] After you met [Defendant], what type of things would you do together? [MR. KENT:] Oh my, let’s see. We became friends and she . .. said, ‘From now on I will take you to all the hospitals you have to go to or doctors,’ and that was kinda the starter. And she did. And we just had a pleasant relationship. [PROSECUTOR:] What else did you and her do? What other kind of activities? [MR. KENT:] Not much, really. [PROSECUTOR:] What would you talk about? What kinds of things would you and her talk about? [MR. KENT:] [Laughs] [PROSECUTOR:] What did you have in common? I guess that’s a way of putting it. What did you and her have in common that you liked to talk about? [MR. KENT:] I guess, cars [laughs]. [PROSECUTOR:] What was the friendship based upon? . . . What type of conversation would she have with you, Mr. Kent? What sort of subjects would she bring up and talk about with you? [MR. KENT:] I guess, after a year or so we kind of looked a little closer to ourselves and we just liked each other. [PROSECUTOR:] How did you come to think of [Defendant] after a time? You said you were friends, but after a while how did you come to think of her? What did you think of her in your mind as the relationship that you had with her after a while? [MR. KENT:] It was nice. Pleasant. [PROSECUTOR:] Okay, but how would you describe her? What have you described her as in the past to people when you were . . . getting along with her quite well? How had you described her to other people? As your what? [MR. KENT:] I guess, my friend. And my [pauses]— [PROSECUTOR:] Your what? [MR. KENT:] My friend, and uh, how will I say it— [PROSECUTOR:] What are you trying to say? [MR. KENT:] I’m trying to say that she meant more to me than what I thought. [PROSECUTOR:] When you say meant more to you though, in what regard? Meant more to you in what way? ‘Cause we have friends, you know, I mean, some people I might just consider a friend, like an acquaintance or someone that I might just see on the street and talk to. Is that all that it was with [Defendant] in your mind? [MR. KENT:] No. [PROSECUTOR:] So, Mr. Kent, let me be just very blunt. Did you have a romantic interest in [Defendant] at some point? [MR. KENT:] Yes. [PROSECUTOR:] So then in some ways you told people that you regarded her as what to you? [MR. KENT:] As my close friend, and I wouldn’t say quite a lover ‘cause I’m eighty-six, eighty-seven years old. But it was very nice and also ... we were both content. Although Mr. Kent did not testify that he thought of Defendant as his romantic partner, the caseworker testified that Defendant knew that Mr. Kent thought of Defendant as his “girlfriend.” {12} The prosecutor did not ask Mr. Kent any questions about whether he relied on his impression that Defendant was not dating or married to anyone during the time that he allowed Defendant access to his bank accounts. The prosecutor did not ask Mr. Kent if he gave Defendant access to his accounts because he thought of her as his romantic partner. Furthermore, on cross-examination, when defense counsel asked Mr. Kent whether he had been “tricked” into giving Defendant access to his account, Mr. Kent replied that he had not: [DEFENSE COUNSEL:] You . . . granted [Defendant] access to that account, right? [MR. KENT:] Yes. [DEFENSE COUNSEL:] Nobody tricked you, nobody did anything to try and take advantage of you. . . . You did it freely and willingly, correct? [MR. KENT:] Right. {13} In his closing argument, the prosecutor asserted: [I]t’s hard for [Mr. Kent] to come out and say he thought that [Defendant] . . . was his girlfriend, but that’s what he thought about her, that’s how he thought of her, and she encouraged it. . . . by lying to Mr. Kent about who her husband was... . [and] she didn’t think that way about him.[1] DISCUSSION {14} The narrow question we must answer in this appeal is whether there was sufficient evidence presented to establish beyond a reasonable doubt that Mr. Kent relied on Defendant’s deception about her relationship and marriage status when he allowed Defendant to use his money and access his accounts. For reasons we explain below, we conclude that the evidence was insufficient. A. Elements of Criminal Fraud {15} The crime of “[f]raud consists of the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations.” Section 30-16-6(A). A misrepresentation for purposes of criminal fraud may include a deceptive silence or omission. See State v. Stettheimer, 1980-NMCA-023, ¶¶ 9-14, 94 N.M. 149, 607 P.2d 1167. As contained within our uniform jury instructions and the jury instructions used in this trial, the state must also present evidence sufficient to prove that “[b]ecause of the . . . victim[’s] reliance on [the misrepresentation], the] defendant obtained [a thing of value].” UJI 14-1640 NMRA (emphasis added). {16} A critical inquiry in this appeal is what constitutes reliance. Although the jury in this case was not instructed about how to determine whether Mr. Kent’s reliance on Defendant’s misrepresentation caused Mr. Kent to allow Defendant to access his accounts, we find it helpful to refer to UJI 14-134 NMRA in interpreting the legal requirements under which the element of reliance must be proved in a criminal trial for fraud. Although not used in this trial, UJI 14-134 is a criminal uniform jury instruction that “should be used in cases [other than homicide] in which causation is an issue.” UJI 14-134 n.l (emphasis added). UJI 14-134 provides, in pertinent part: In addition to the other elements of the crime . . . , the state must also prove ... beyond a reasonable doubt that[] . . . [t]he act of the defendant was a significant cause of the injury or harm. The defendant’s act was a significant cause of the injury or harm if it was an act which, in a natural and continuous chain of events, uninterrupted by an outside event, resulted in the injury or harm and without which the injury or harm would not have occurred. (Emphasis added.) Thus, to sustain a fraud conviction, we conclude that the State must prove beyond a reasonable doubt that without the defendant’s misrepresentation, the defendant would not have obtained the thing of value. Id.; accord State v. Young, 1998 ME 107, ¶ 14, 711 A.2d 134, 137 (referring to the Maine Criminal Code’s definition of causation in determining the nature of the causal relationship that must be proved in a theft by deception prosecution and framing the issue as whether the defendant “would not have obtained the money but for his deceptive act”); 3 Charles E. Torcía, Wharton’s Criminal Law § 427 (15th ed. 1995) (stating that, in proving a defendant obtained money or property by false pretenses, it is not “necessary . . . that the false representation be the paramount cause for the victim’s surrender of his property; it is sufficient merely that the false representation be a cause without which the victim would not have surrendered his property” (emphasis added)). B. Standard of Review and General Principles {17} In conducting a sufficiency-of-the-evidence analysis, we review the evidence in the light most favorable to the verdict “to determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to [the] conviction.” State v. Hornbeck, 2008-NMCA-039, ¶ 33, 143 N.M. 562, 178 P.3d 847 (internal quotation marks and citation omitted). “We do not re-weigh the evidence or substitute our judgment for that of the fact-finder, so long as sufficient evidence supports the verdict.” Id. W e remain mindful, however, that “evidence that is sufficient to allow a rational juror to make a finding adverse to a defendant under a lesser preponderance-of-the-evidence standard [of proof] will not necessarily suffice to allow a rational factfinder to reach the subjective state of certitude required by the beyond-a-reasonable-doubt standard.” State v. Garcia, 2004-NMCA-066, ¶ 9, 135 N.M. 595, 92 P.3d 41, rev’d in part on other grounds by State v. Garcia, 2005-NMSC-017, 138 N.M. 1, 116 P.3d 72. “[Ejvidence equally consistent with two inferences does not, without more, provide a basis for adopting either one — especially beyond a reasonable doubt.” Garcia, 2005-NMSC-017, ¶ 12 (internal quotation marks and citation omitted); see also Baca v. Bueno Foods, 1988-NMCA-112, ¶ 15, 108 N.M. 98, 766 P.2d 1332 (“Evidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition.”). {18} “Although appellate courts are highly deferential to a jury’s decisions, it is the independent responsibility of the courts to ensure that the jury’s decisions are supportable by evidence in the record, rather than mere guess or conjecture.” State v. Slade, 2014-NMCA-088, ¶ 14, 331 P.3d 930 (internal quotation marks and citation omitted). In State v. Maes, this Court found the Second Circuit’s discussion in Goldhirsh Grp., Inc. v. Alpert, 107 F.3d 105, 108 (2d Cir. 1997) helpful in discerning the fine line that sometimes exists between permissible inference and impermissible speculation: The line between permissible inference and impermissible speculation is not always easy to discern. When we ‘infer,’ we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is ‘reasonable.’ But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it ‘speculation.’ When that point is reached is, frankly, a matter of judgment. State v. Maes, 2007-NMCA-089, ¶ 18, 142 N.M. 276, 164 P.3d 975 (quoting Goldhirsh Grp., Inc., 107 F.3d at 108). D. Analysis 1. Timing of Defendant’s Deception and Mr. Kent’s Decision to Allow Her Access to His Accounts {19} We begin our analysis by noting that at the time that Mr. Kent began allowing Defendant to access his accounts for her own purposes in October 2010 and at the time he made her a joint owner on his accounts on December 15, 2010, and January 4, 2011, Defendant was not married. The evidence shows that Defendant married Mr. Marquez on January 20, 2011. Although Mr. Marquez testified that prior to his marriage with Defendant, he and Defendant “cohabitat[ed] . . . off and on[,J” his testimony does not establish when their relationship began or whether it was exclusive or continuous prior to their marriage.[2] Thus, the evidence adduced at trial did not show that Defendant had deceived Mr. Kent in any way at the time that Mr. Kent decided to allow Defendant access to his accounts and to make her a joint owner of his accounts. Thus, the point that the State raised at trial and again raises in its answer brief — that Mr. Kent “did not know he was putting a married woman on his accounts” — is not persuasive because it is based on the assumption of a fact that was actually disproved by the evidence at trial. {20} Defendant’s deceptive behavior becomes sufficiently apparent, however, when she married and moved in with Mr. Marquez in January 2011 and not only failed to tell Mr. Kent this significant detail about her personal life during the “couple times a week” they spent together, but blatantly lied to Mr. Kent when she introduced Mr. Marquez to him as her gay friend in May 2011. Regardless of whether Defendant’s deception established her intent to defraud Mr. Kent when she hid the fact that she was married to Mr. Marquez, the issue on appeal is not what Defendant intended, but rather what Mr. Kent himself relied upon when he allowed her to use his accounts. 2. Insufficient Evidence of Reliance {21} During the State’s examination of Mr. Kent at trial, the prosecutor did not ask Mr. Kent whether he would have allowed Defendant to continue to access his accounts if he knew that Defendant was involved with and had eventually married Mr. Marquez. Instead, when the prosecutor asked Mr. Kent “what caused” him to allow Defendant to access his money and make Defendant a joint owner on his accounts, he replied, “[i]t would be easier for her and her bookkeeping and also the contact with money and then she would replace it.” On cross-examination, Mr. Kent also testified that he put Defendant on his accounts because he “wanted to help her out” with “her family, . . . her children, and . . . other things.” He told the caseworker that he allowed Defendant to access his accounts because “he felt sorry for [Defendant] and that he was helping her.” Mr. Kent testified that, beyond their first meeting, the status of Defendant’s romantic affairs was not “pertinent” to him until “now.” And when asked whether he felt he was “tricked” into allowing Defendant to use his bank accounts, Mr. Kent replied that he did not. This testimony is not sufficient to prove that Mr. Kent would not have given Defendant access to his accounts but for his impression that she was romantically available to him. See UJI 14-134; Young, 711 A.2d at 14; Torcía, supra, § 427. {22} Although Mr. Kent was “shocked” when he discovered that Defendant had been married to Mr. Marquez, the evidence at trial was also insufficient to directly connect Mr. Kent’s discovery of this fact with his decision to finally cut Defendant off from his accounts. The prosecutor did not ask Mr. Kent whether learning of Defendant’s marriage prompted him to stop her from using his accounts. Instead, the evidence showed that Mr. Kent finally cut Defendant off from accessing his accounts for several other reasons: “[t]he bank . . . kept hounding [him],” his “money in the bank . . . was down[,]” he “finally woke up to see what was really happening to [his] money,” and that “after a while it got so bad . . . [he] had to stop it.” Mr. Kent testified that “[his] degeneration of [his] . . . contact with [Defendant,]” began when “the sheriffs representatives came out and talked” to him — he did not testify that learning of Defendant’s marriage from Mr. Marquez caused him to take action or was the reason he ended his relationship with her. Furthermore, there was no evidence that Mr. Kent cut off Defendant’s access to his accounts prior to her last transaction on February 14, 2012, which was at least two weeks after Mr. Marquez stated he told Mr. Kent about his marriage to Defendant in January 2012. {23} Without testimony from Mr. Kent regarding what he relied upon and whether he would have continued to allow Defendant to access his accounts had he known her true marital status, the remainder of the evidence presented at trial would, at best, be equally consistent with two hypotheses on the factual element of reliance. See Garcia, 2005-NMSC-017, ¶ 12; Baca, 1988-NMCA-112, ¶ 15. One that, irrespective of Defendant’s marital status, Mr. Kent’s own testimony appears to support the position that he would have allowed Defendant to access his money to assist with her children’s financial needs because they were close friends, he felt sorry for her, and because she provided him with assistance and companionship. The second being that, irrespective of Defendant’s assistance and companionship, Mr. Kent only allowed Defendant to access his accounts because of he thought of her as his romantic partner. {24} Mr. Kent was the State’s primary witness and testified at length in this case. Evidence of Mr. Kent’s reliance on Defendant’s misrepresentation of her marital status was not the type of evidence that was clandestine in nature, could only be proved by circumstantial evidence, and therefore required the jury to disregard Mr. Kent’s testimony and extract contradictory inferences from other indirect testimony. Cf. State v. Gallegos, 2011-NMSC-027, ¶ 45, 149 N.M. 704, 254 P.3d 655 (recognizing that because conspiracies are clandestine in nature, establishing evidence of an agreement between the conspirators is seldom available, the jury may infer such an agreement from the parties’ conduct and the surrounding circumstances, even though it raises the specter of a conviction by guess and speculation). The State offers no explanation for its failure to ask Mr. Kent about what he relied upon when he gave Defendant money and allowed her access to his accounts. Even if the jury could also infer that, had the victim known the truth about Defendant’s marital status, he possibly would not have given Defendant money or access to his accounts, we conclude that, based upon the evidence presented, the jury could not reasonably make such a circumstantial inference beyond a reasonable doubt. See Garcia, 2004-NMCA-066, ¶¶ 9, 11; Slade, 2014-NMCA-088, ¶ 14; cf. Commw. v. Imes, 623 A.2d 859, 863 (Pa. Super. Ct. 1993) (concluding that the government failed to prove the element of reliance on a false impression where “none of the [purported victims] were called to testify at the trial[,]” and “[consequently, none of them could state whether they relied on [the] false impression”). The State failed to establish such a basis of reliance when Mr. Kent competently testified at trial. Asking the jury to determine the victim’s reliance from these two plausible inferences presented by the State, without asking the victim about the matter during his trial testimony, was the type of evidentiary guesswork and speculation that is insufficient for the State to meet its burden of proof. See Slade, 2014-NMCA-088, ¶ 14. {25} Therefore, because the State carried the burden to prove beyond a reasonable doubt that “without” Defendant’s misrepresentation about her marital status, Mr. Kent would not have allowed her to access his accounts, the other indirect and contradictory circumstantial evidence was insufficient to infer the element of reliance necessary to sustain Defendant’s fraud conviction. UJI14134 (providing that, in criminal trials in which causation is an issue, the state must prove that “without” the defendant’s act, “the injury or harm would not have occurred”); see Young, 711 A.2d at 14; Torcia, supra, § 427; see also Hornbeck, 2008-NMCA-039, ¶ 33 (providing that substantial evidence must support every element essential to the conviction). On the record before us in this case, we hold that “the link between the facts and the conclusion” is “so tenuous that we call it ‘speculation.’ ” Maes, 2007-NMCA-089, ¶ 18 (internal quotation marks and citation omitted). {26} We note that what makes Defendant’s conduct troubling is the age and vulnerability of Mr. Kent. He was in his mid-eighties, just lost his wife of thirty-six years, and needed someone to take him to his medical appointments and provide personal companionship. Although Defendant helped Mr. Kent in these ways, she also used his vulnerability to benefit herself in an amount that appeared somewhat disproportionate. Rather than ask Mr, Kent to testify about whether he relied upon Defendant’s marital status to allow her to access his accounts, the State asked the jury to infer such reliance based upon other indirect and contradictory circumstantial evidence. We cannot speculate as to why the State presented its case in this manner. This was either a tactical trial decision by the prosecutor or an inadvertent error. Unfortunately, the other indirect circumstantial evidence was insufficient to establish the element of reliance beyond a reasonable doubt. E. Computer Access with Intent to Defraud {27} We also conclude that there was insufficient evidence to support Defendant’s conviction of computer access with intent to defraud. Our Supreme Court has concluded that “the Computer Crimes Act was intended by the [L] egislature to deter and punish crimes committed, at least in a manner of speaking, against computers, or through the abuse of computer sophistication.” State v. Rowell, 1995-NMSC-079, ¶ 12, 121 N.M. 111, 908 P.2d 1379. The Court noted that the Senate bill upon which the Act was based stated that “[t]he [Ljegislature recognizes a dramatic increase in computer-related crimes . . . through the introduction of fraudulent data into a computer system, the unauthorized use of computer facilities, the alteration or destruction of computerized information or files[,] and the stealing of financial information, data [or] other assets.” Id. ¶ 12 n.2. It observed that the Act was not intended to apply to the use of a computer as “a passive conduit through which the defendant’s criminal activity passed.” Id. ¶ 11. {28} In this case, Defendant did not introduce “fraudulent data into a computer system,” use “computer facilities” without “[authorization,] . . . alter[] or [destroy] . . . computerized information or files [,]” nor did she steal “financial information, data [or] other assets.” Id. ¶ 12 n.2. Instead, Defendant used the computer as “a passive conduit” to access accounts and transfer funds, just as any banking customer would. Id. ¶ 11. {29} Furthermore, because we have concluded that the evidence was insufficient to prove that the underlying transfers made via the computer were criminal, and because Mr. Kent expressly approved Defendant’s use of a computer to perform these transfers, the elements of computer access with intent to defraud could not be proved beyond a reasonable doubt. CONCLUSION {30} Because we reverse Defendant’s convictions and remand the case to the district court with instructions to vacate Defendant’s convictions, we need not address the other issues that Defendant raises on appeal. {31} IT IS SO ORDERED. TIMOTHY L. GARCIA, Judge I CONCUR: M. MONICA ZAMORA, Judge JONATHAN B. SUTIN, Judge (dissenting). The prosecutor also asserted in his closing argument that Defendant’s asking Mr. Kent for $5,000 for breast surgery upon their first meeting in May 2010, and then not having the surgery, was the first instance of fraud. However, the jury instructions and Defendant’s resultant conviction covered conduct occurring only between the dates of October 10,2010, andFebruaty 13, 2012. We assume this is why the State did not raise this issue in its answer brief. The State confirmed at oral argument that Defendant’s May 2010 conduct should not be considered in upholding her fraud conviction. Our review of the trial testimony belies the State’s assertion in its answer brief that “Defendant was living at . . . [Marquez]’s house” at the time that she met Mr. Kent. To the contrary, Mr. Marquez testified that prior to their marriage, he and Defendant “cohabitatfed] ... off and on.” After he and Defendant married in January 2011, Mr. Marquez “moved into the mobile home with her[.]” Later, Mr. Marquez bought a home and he and Defendant moved there. Mr. Marquez stated that Defendant began “developing” her relationship with Mr. Kent while she was living at [his] home. He did not testify that he and Defendant were living together when Defendant and Mr. Kent met.