2007-NMCA-089

164 P.3d 975

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Lorraine MAES, Defendant–Appellant.**

**No. 25,910.**

Court of Appeals of New Mexico.

June 5, 2007.

Gary K. King, Attorney General, Santa Fe, NM, M. Victoria Wilson, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

ALARID, Judge.

{1} This case requires us to decide whether the State adduced evidence sufficient to permit a reasonable jury to find Defendant guilty beyond a reasonable doubt of the crime of unlawful possession of methamphetamine. We hold that the State's evidence was insufficient and that the district court erred by failing to direct a verdict of acquittal.

### FACTUAL BACKGROUND

{2} Defendant–Appellant, Lorraine Maes, was charged in a criminal information with a single count of illegal possession of methamphetamine.[1] The charge was tried to a jury on February 28, 2005.

{3} The State's case was based on the testimony of two witnesses: Sergeant Jay Longley of the Clovis Police Department; and Kevin Brown, an analyst employed by the New Mexico Department of Public Safety

---

1. The criminal offense of unlawful possession of a controlled substance is set out at NMSA 1978, § 30–31–23 (1990) (amended 2005).

Crime Lab in Santa Fe. Defendant did not testify and did not call any witnesses.

{4} Sgt. Longley testified that he had twenty-three years experience in law enforcement and had received over 700 hours of specialized training in narcotics investigation. He was among a team of officers who executed a search warrant on the afternoon of May 1, 2003, at a house believed to be the residence of a Hispanic male, who Sgt. Longley identified as Luis Sena. The warrant was supported by information provided by a confidential informant, who claimed on more than one occasion to have observed the Hispanic male in possession of controlled substances at the subject house. Defendant was not mentioned in the warrant. When the officers arrived to execute the warrant, neither Sena, nor any other Hispanic male, was present. Defendant; Defendant's adult daughter; and a small child were present when the officers arrived to execute the warrant. The officers gave a copy of the warrant to Defendant because "she was the only one there to serve it on."[2] Sgt. Longley assumed from the evidence discovered in the search that Defendant lived in the house.

{5} In the course of executing the search warrant, officers observed an Alka–Seltzer box sitting on the headboard of a bed in one of the bedrooms. The officers opened the box and discovered a bottle cap, which they seized. The officers discovered and seized another bottle cap that was sitting in a shoe box at the bottom of a TV stand in the same bedroom. Sgt. Longley did not recall whether the shoe box had been covered with a lid. The officers observed trace amounts of a white granular residue inside both bottle caps. Sgt. Longley testified that based on his training in narcotics investigation, the presence of the residue inside the bottle caps was consistent with a practice of intravenous drug users, who use bottle caps as a container for mixing drugs with water to prepare a solution for injection. The officers subjected the residue in the bottle caps to a field test, which was positive for methamphetamine.

The officers also seized a corner portion of a plastic baggie which was discovered in the same bedroom. The corner contained traces of a white powder. Sgt. Longley testified that methamphetamine and cocaine were often packaged in the corner of a plastic baggie. Sgt. Longley could not recall if the baggie corner was out in the open when it was discovered.

{6} During the search of the house, the officers seized two pieces of mail, one from the magistrate court and one from the Social Security Administration, addressed to Defendant. Neither of the two pieces of mail was addressed to Defendant at the house that was the subject of the search warrant. Sgt. Longley did not recall observing any bills or personal papers belonging to Defendant other than the two pieces of mail.

{7} The officers observed women's clothing hanging in a closet in the bedroom where the bottle caps and baggie corner were seized. Sgt. Longley did not recall the size of the clothing. Sgt. Longley was not involved in the search of a second bedroom.

{8} The officers arrested Defendant. In response to being arrested, Defendant denied living at the subject house.

{9} The house that was the subject of the May 1, 2003, search had been the subject of three prior search warrants. Defendant was not present during the first two executed search warrants. The third warrant had been executed three or four weeks prior to the May 1, 2003 search. Sena, Defendant, Defendant's son, a woman identified as Melody Sorge, and other individuals whose identities Sgt. Longley did not recall were present while the third warrant was executed. Sgt. Longley could not recall whether Defendant had been inside the house while the third warrant was executed. On this prior occasion, the executing officers arrested Sena and Sorge, but not Defendant.

{10} Kevin Brown described the scientific tests he performed to identify the white resi-

---

**2.** Rule 5–211(C) NMRA states that "[t]he officer seizing property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the affidavit for search warrant, and the search warrant and a copy of the inventory of the property taken or shall leave the copies of the affidavit for search warrant, the search warrant and inventory at the place from which the property was taken."

due on the bottle caps seized during the execution of the search warrant. Brown testified that based on the tests he performed he was 100% certain that the white residue was methamphetamine. He testified that the total amount of the methamphetamine he recovered from the items seized by the officers was tiny—about the size of a grain of sand. The amount he recovered was too little to weigh and was not enough for consumption. Brown testified that prior to being trained in drug identification, he would not have been able to identify the residue observed on the bottle caps.

{11} Defendant moved for a directed verdict at the close of the State's case.[3] Defendant's counsel conceded that there was sufficient evidence to establish that methamphetamine was present in the house. Defendant's counsel argued that the State had not proven beyond a reasonable doubt that Defendant had knowledge of the methamphetamine residue or that Defendant had exercised control over it. The State responded that there was evidence that Defendant lived in the home or was in control and custody of the home and that the jury, therefore, could conclude that the drugs found in the home were in Defendant's care and control. The judge felt that the State's case was weak with respect to possession and control, but nevertheless allowed it to go to the jury:

> With regard to the possession and control: I think frankly this is a, this case is struggling a little bit with regard to that, but I think there's prima facie evidence sufficient to do that. That's said as candidly as I can say it, I guess. Is that, this can go in to the jury because it only has to have a prima facie standard to do that.

The district court submitted the case to the jury, which returned a verdict finding Defendant guilty of possession of methamphetamine.

## DISCUSSION

 {12} In criminal cases, we apply the following principles in conducting sufficiency-of-the-evidence review:

[W]e review the record, marshaling all evidence favorable to [the factfinder]'s findings. . . . [W]e accept any interpretation of the evidence that supports the [factfinder]'s findings, provided that such a view of the evidence is not inherently improbable. *Crownover v. Nat'l Farmers Union Prop. & Cas. Co.*, 100 N.M. 568, 571, 673 P.2d 1301, 1304 (1983). We determine whether the evidence supports any conceivable set of rational deductions and inferences that logically leads to the finding in question. *Jackson v. Virginia*, 443 U.S. 307, 319 n. 13, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (noting that court conducting sufficiency of the evidence review does not attempt to scrutinize the reasoning process actually used by factfinder). We must be satisfied that the evidence was sufficient to establish the facts essential to conviction with the level of certainty required by the applicable burden of proof. *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (noting that *Jackson* requires consideration of beyond a reasonable doubt standard in determining sufficiency of evidence in criminal case); *see also* 2A Charles Alan Wright, *Federal Practice and Procedure: Criminal* § 467 (3d. ed.2000) (noting minimal support for proposition that standard for sufficiency of evidence is same in civil and criminal cases and ultimate rejection of this view by Supreme Court in *Jackson* ). To support a conviction under a beyond a reasonable doubt standard, the evidence and inferences drawn from that evidence must be sufficiently compelling so that a hypothetical reasonable factfinder could have reached "a subjective state of near certitude of the guilt of the accused." *See Jackson*, 443 U.S. at 315, 99 S.Ct. 2781.

*State v. Wynn*, 2001–NMCA–020, ¶ 5, 130 N.M. 381, 24 P.3d 816. In applying these standards, we must defer to the jury's evaluation of the evidence, while at the same time insuring that the jury has given effect to the heightened, beyond-a-reasonable-doubt stan-

---

**3.** Rule 5–607(E) NMRA requires the district court to determine the sufficiency of the evidence after the close of the State's case-in-chief and after the close of evidence "whether or not a motion for directed verdict is made."

dard of proof applicable to criminal trials. We must allow the jury to draw reasonable inferences, yet, in deferring to hypothetical reasonable jury inferences, we must avoid tailoring the law to fit the State's evidence.

{13} The jury in Defendant's trial was given the following definition of the element of possession:

A person is in possession of methamphetamine when she knows it is on her person or in her presence, and she exercises control over it.

Even if the substance is not in her physical presence, she is in possession if she knows where it is, and she exercises control over it.

A person's presence in the vicinity of the object or his knowledge of the existence or the location of the object is not, by itself possession.

This instruction closely tracks the mandatory uniform jury instruction adopted by our Supreme Court. UJI 14–130 NMRA (defining "possession"). The present case turns upon whether the facts proved by the State at Defendant's trial and gave rise to reasonable inferences that Defendant (1) knew of the presence of the methamphetamine residue, and (2) exercised control over it.

■ {14} We are satisfied that the State's evidence was sufficient to allow a reasonable jury to find beyond a reasonable doubt that Defendant had an ongoing connection to the house where the methamphetamine was seized. But the State's evidence also established that Defendant's access to the house was not exclusive. In view of the undisputed fact that Defendant's access to the house was not exclusive, the State could not rely solely on Defendant's access to the house to support an inference that Defendant was in constructive possession of the methamphetamine residue. Cf. State v. Herrera, 90 N.M. 306, 307, 563 P.2d 100, 101 (Ct.App.1977) (affirming conviction for trafficking in heroin; emphasizing admission by defendant's spouse that the defendant and spouse jointly possessed heroin found buried on premises occupied by the defendant and spouse); State v. Bowers, 87 N.M. 74, 76–77, 529 P.2d 300, 302–03 (Ct.App.1974) (reversing convictions for possession of cocaine; rejecting State's argument that the defendants' constructive possession of cocaine could be inferred from the defendants' common control of the house where cocaine was discovered).

{15} We find our prior decision in State v. Brietag, 108 N.M. 368, 772 P.2d 898 (Ct.App. 1989), to be controlling as to the reasonableness of inferences of knowledge and control. For the convenience of the reader, we set out the facts summarized in our opinion in Brietag:

On May 1, 1987, police executed a search warrant at 636 South Miranda in Las Cruces. The house was rented to defendant [Douglas Brietag], under the name John King, by the Elephant Butte Irrigation District in a rental agreement dated July 1, 1986. Police placed the house under surveillance during April 1987; the surveillance ended several days before the warrant was executed.

Many persons, including defendant, were observed coming to and going from the house. Police observed defendant at the house all night on at least one of two occasions when they maintained an all-night surveillance of the residence. One of the officers involved in the surveillance testified she was not sure who was living at the house. Seven or eight people were at the house when the warrant was executed. The agent testified that she recognized some of these individuals as those who had stayed all night during her surveillance. Police said they frequently observed a Michael Hulting at the house and assumed he was living there. On the night of the search, Hulting told police he had been staying at the house for about one month.

When police searched the residence, they found thirty grams of cocaine in the southeast bedroom and approximately one pound of marijuana in the laundry room. None of defendant's personal possessions were found in these rooms. Police also searched the southwest bedroom of the house. This bedroom contained a waterbed, a nightstand, a small table, a dresser, and a bookcase. Marijuana and methamphetamines were found in the first drawer of the nightstand. A small, silver spoon containing cocaine residue and a ra-

zor blade were found in the second drawer of the nightstand, along with a photograph of defendant and two savings bonds payable to a Dustin Wallace. Three blank checks were also found in the second drawer. Two of the checks were drawn on the account of a Tracy Ann Sweat and the third on the account of a Shelly Newsome.

Police seized methamphetamine from a drawer beneath the waterbed. They found numerous other papers in the waterbed drawers, including envelopes and papers with assorted names on them. On the table, police found a triple-beam scale, a powder preparation system, baggies, a piece of plate glass, and straws. They also discovered marijuana in a paper sack under the table.

Other items were found throughout the southwest bedroom. In a closet, the police found twelve rifles and handguns, along with ammunition, and a wallet containing $5,000.00. Rent receipts made out to defendant were found on the bookcase. Also discovered were a birth certificate in defendant's name, electric bills addressed to him, and photographs of him with family members. Other papers with various names were found in the bedroom. Telephone bills and hunting notices were found in the bookcase. Police could not say to whom these items were addressed.

A pile of clothing including jeans, shirts, and T-shirts was found in the bedroom; however, police were unable to say whether the clothing would have fit defendant, a very large man. A small notebook, socks, and underwear were found in the dresser, along with a sawed-off shotgun and other papers. The state presented no testimony concerning the ownership of these items and offered no fingerprints as evidence at trial.

Defendant was not at the house when the warrant was executed. He was arrested later at an address outside the Las Cruces city limits. Cindy Savage, a friend of defendant's, testified that defendant had been renting a room in her mobile home and living with her for about a month prior to the search.

*Id.* at 368–69, 772 P.2d at 898–99.

{16} There are striking similarities between the present case and *Brietag.* In each case the State comes forward with evidence that the defendant had an ongoing connection to the house where the evidence was discovered that would have provided the defendant with an opportunity to bring drugs into the house or to exercise actual physical control over drugs present in the house; that clothing appropriate to the defendant's gender was present in a bedroom in which drugs were discovered; and, that other individuals had access to the areas of the house where drugs were discovered.

{17} In *Brietag,* we reversed the defendant's convictions based on our conclusion that the evidence was insufficient to establish the defendant's constructive possession. We think that the State's evidence of constructive possession in *Brietag* was easily as strong, and in many respects much stronger, than the State's case against Defendant. Defendant's case is distinguishable from *Brietag* in one obvious respect: Defendant was present when the warrant was executed, while the defendant in *Brietag* was not. We do not believe that this distinction is particularly helpful to the State in Defendant's case. In non-exclusive access cases, the problem the State faces is the alternative inference that some other individual with access to the premises is responsible for the presence of the contraband. A defendant's presence at the time that police choose to conduct a search may, or may not, have significance, depending on the State's theory of constructive possession in a given case. For example, if the police had discovered significant amounts of clearly identifiable illegal drugs out in the open in a common area of the house at the time of the search, the defendant's presence at the time of the search would tend to strengthen an inference of the defendant's knowledge of the drugs. Likewise evidence that the methamphetamine solution was still wet coupled with evidence of the defendant's recent drug use would have increased the significance of the defendant's presence at the time the warrant was execut-

ed. Here, the methamphetamine was present in trace amounts and was concealed from view in a private area of the home. Moreover, the water-methamphetamine solution had dried to a white, granular residue, a circumstance suggesting that the drugs had been mixed into a solution and injected sometime in the past. Sgt. Longley did not testify as to how long it would have taken the solution to dry to a white, granular residue and he did not testify as to how long Defendant had been present in the house prior to the execution of the warrant. In view of these circumstances, Defendant's presence at the time the warrant was served does not materially distinguish Defendant's case from *Brietag.*

{18} As a federal court of appeals has observed:

> The line between permissible inference and impermissible speculation is not always easy to discern. When we "infer," we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is "reasonable." But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it "speculation." When that point is reached is, frankly, a matter of judgment.

*Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108 (2d Cir.1997).

■ {19} Here, the State's evidence was insufficient under *Brietag* to support inferences of knowledge and control to the level of confidence required by proof beyond a reasonable doubt. The link between the facts actually proved by the State, and the facts that the State would have the jury infer—Defendant's knowledge of trace amounts of methamphetamine residue and her exercise of control over that residue—is too tenuous.

The State's case relies upon incomplete strings of inferences such as the State's argument that the jury could infer from the presence of women's clothes in a closet that Defendant occupied the bedroom in which the clothes were found, and from the inference of occupancy, further infer that Defendant controlled the traces of methamphetamine residue found in that room. The State's argument overlooks the absence of evidence that would have supported a reasonable inference that the clothes were Defendants. *Cf. Brietag,* 108 N.M. at 369, 370, 772 P.2d 898, 899 (observing that the State produced no evidence that clothes found in a room where illegal drugs were seized were the defendant's clothes).

{20} To find sufficient evidence of constructive possession, we would have to stretch the concept of possession beyond the breaking point. *See State v. Maldonado,* 2005–NMCA–072, ¶ 16, 137 N.M. 699, 114 P.3d 379 (observing that "[t]he concept of substantial evidence is meaningless unless it is linked to a specific definition of a crime [and that] [e]xpand[ing] the definition of the crime and evidence that might otherwise be insufficient becomes 'substantial'"). Constructive possession is "a legal fiction used to expand possession." *State v. Barber,* 2004–NMSC–019, ¶ 22, 135 N.M. 621, 92 P.3d 633. However, because the power to define crimes is committed to the Legislature, *State v. Allen,* 77 N.M. 433, 434, 423 P.2d 867, 868 (1967), and because penal statutes are to be strictly construed, *id.,* we must exercise caution in employing the judicially created legal fiction of constructive possession to criminalize conduct that the Legislature has not clearly proscribed. No New Mexico case has held, as the State argued in the district court, that a person left in charge of a house to which other persons have access is in constructive possession of every item that is present on the premises.[4]

■ {21} We recognize that it may seem "anomalous" to analogize from legal principles designed to protect and enforce legitimate property rights when the property in question is illegal contraband. *State v. Bash,* 670 N.W.2d 135, 139 (Iowa 2003).

---

4. The State relied on this argument both in responding to Defendant's motion for a directed

verdict and in its closing arguments to the jury.

Nevertheless, we are inclined to apply the basic distinction between property that is "mine" and property that is "yours," "his," or "hers" even among sellers and consumers of illegal drugs and their housemates, relatives, friends, and guests. A defendant's knowledge of the location of a another person's stash of drugs coupled with the physical ability to exercise control over them in the owner's absence does not justify an inference of the defendant's constructive possession of drugs anymore than a defendant's knowledge of the location of a housemate's stash of cash would justify an inference that the defendant constructively possessed the housemate's money in the housemate's absence. *See id.* The State's theory of constructive possession—that Defendant necessarily controlled every item in the house of which she had knowledge—is not a correct statement of the criminal law of constructive possession, and we expressly disapprove of closing arguments that incorporate this view of the law.

{22} As we recently noted,

A trial court "has the right, and it is its duty," to withdraw a case from the jury and direct a verdict for a defendant when the State has failed to come forward with substantial evidence that the defendant committed the offense charged. When a trial court improperly fails to direct a verdict for the defendant it is our responsibility to correct the error by doing on appeal what the trial court failed to do at trial, and we are not precluded from correcting the trial court's error in even submitting the case to the jury by the fact that a jury has found against the defendant.

*Maldonado*, 2005–NMCA–072, ¶ 17, 137 N.M. 699, 114 P.3d 379. The district court erred by denying Defendant's motion for a directed verdict. We reverse Defendant's conviction and remand with instructions to enter a directed verdict of acquittal.

{23} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, and MICHAEL E. VIGIL, Judges.