STATE V. BICE

This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**STATE OF NEW MEXICO,**
**Plaintiff-Appellee,**
**v.**
**JAYSON BICE,**
**Defendant-Appellant.**

No. A-1-CA-34978

COURT OF APPEALS OF NEW MEXICO

January 29, 2019

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY, Briana H. Zamora, District Judge

**COUNSEL**

Hector H. Balderas, Attorney General, Marko D. Hananel, Assistant Attorney General, Santa Fe, NM, for Appellee

Bennett J. Baur, Chief Public Defender, Nina Lalevic, Assistant Appellate Defender, Santa Fe, NM, for Appellant

**JUDGES**

HENRY M. BOHNHOFF, Judge Pro Tempore. I CONCUR: M. MONICA ZAMORA , Chief Judge, JENNIFER L. ATTREP, specially concurring.

**AUTHOR:** HENRY M. BOHNHOFF

**MEMORANDUM OPINION**

**BOHNHOFF, Judge.**

**{1}** Defendant Jayson Bice was a laboratory technician for an Albuquerque company that performs alcohol and drug testing services. He was prosecuted for using his

position to try to obtain sexual favors from women. A jury convicted him of three counts of extortion pursuant to NMSA 1978, Section 30-16-9 (1963), and two counts of bribery of a witness pursuant to NMSA 1978, Section 30-24-3.1 (1991). Defendant makes two arguments on appeal: (1) the evidence was insufficient to support his convictions; and (2) the convictions for both bribery and extortion violated double jeopardy and in any event are mutually exclusive crimes. For the following reasons, we affirm.

**BACKGROUND**

**{2}** Evidence presented over the course of Defendant's two-week trial established the following.

**{3}** Antoinette Osborne. Ms. Osborne testified for the State. She is a special education teacher for Albuquerque Public Schools. She was arrested for driving while intoxicated. While in custody, she was asked if she would like to have an independent blood draw. She accepted the offer and then found the number for Defendant's company in the phone book. Defendant answered her call, and he came to the jail to conduct the blood draw.

**{4}** Ms. Osborne did not hear from Defendant again until a month later when he called her and told her there were some discrepancies in her blood; he invited her to come to his office to discuss them. Defendant told Ms. Osborne that he was open twenty-four hours a day and that she could come that evening, but not to let anyone know that she was coming.

**{5}** Ms. Osborne brought her friend, Kaitlyn Houston, with her to Defendant's office. Defendant told Ms. Houston to stay in the waiting room and led Ms. Osborne into another room. Defendant told Ms. Osborne that she stuck out in his mind because she was a teacher and he knew that she did not want to lose her job. Defendant told her that he wanted to help her and did not "do this for everybody." Defendant continued to mention Ms. Osborne's job, and told her that he could change her blood results because he had the power to "fix it." Defendant told her he was going to do everything he could do to make sure that her scores were lower to help her keep her job. Defendant made clear that he could make the results lower or higher.

**{6}** Ms. Osborne then asked how much money Defendant wanted to change her blood test results. He told her that he could not accept money because that would be a bribe. Ms. Osborne stated that she then asked Defendant how she would pay for this if he did not accept money, to which he responded, "You're a smart girl. You have a great head on your shoulder[s]. You're a smart girl. You're going to do whatever you have to do to get this off of your record. And we will make a deal, and we'll figure it out together. You're a smart girl." Defendant told Ms. Osborne he was going to do more tests and then they would figure out when she would come back to "start our deal."

**{7}**     Ms. Osborne met with her lawyer the next day, and her lawyer immediately took her to the district attorney's office. While there, she placed a phone call to Defendant, which was recorded.

**{8}**     During the call, Defendant told Ms. Osborne that he could possibly draw another blood sample from her. Defendant told Ms. Osborne that the night before when they had met he was "trying to dance around, . . . everything[,]" however, he wanted to get it to "where everything [would] work out." Ms. Osborne asked Defendant what would happen if she was unable to get better results, to which Defendant responded that she was "going to get a better result than [she] had" and that it was not "going to be a problem at all." Defendant then stated, "I know you're a school teacher and you want this. But, inevitably, you know, I don't want any cash coming from your hands to mine. You know what I mean?" He further stated, "I know you get the gist of . . . what I was saying[,] if you don't then I can't help you. I don't know how else to say it than that[.]"

**{9}**     Ms. Osborne made another recorded call to Defendant to set up a meeting with him. Ms. Osborne told Defendant that she told another teacher about everything but that teacher was the only other person who knew. Defendant responded that she should not tell too many people because she did not want to end up in the *Albuquerque Journal*. They then arranged for Ms. Osborne to come to Defendant's office that day.

**{10}**     During the meeting Ms. Osborne wore recording equipment that law enforcement had provided her. After briefly discussing new and lower test results that Defendant had for Ms. Osborne, Defendant told her that he could and wanted to help her. He told her that she was a "smart girl" and that she had a "good head on [her] shoulders." Ms. Osborne then asked whether she would have to engage in sexual acts with him, to which he responded affirmatively. They then discussed specific sex acts, and the number of sex acts, he would expect. Defendant indicated that the lower Ms. Osborne expected her score to be, the more sex acts he would expect from her.

**{11}**     During the conversation, Defendant mentioned Ms. Osborne's friend, Ms. Houston. Ms. Osborne explained that both of them "know . . . what's going on." She indicated that Ms. Houston wanted to help, but perhaps not enough to have sex with Defendant. Ms. Osborne asked if this meant that she was going to have to "do more like sexual things with [Defendant]," and Defendant responded, "No."

**{12}**     Ms. Osborne testified that when she first met Defendant she told him she was worried about losing her job and then after that Defendant continually brought up the chance of her losing her job—"[Defendant] let me know that [my job] was being held over my head." Ms. Osborne elaborated that Defendant held her job over her head "[j]ust by talking several times about how important my job was to me, kept reminding me, and then telling me, obviously in some of the transcript, about being in the *Albuquerque Journal*, just kind of really making it clear to me that I needed help because of my job . . . repeating that over and over." Ms. Osborne felt like Defendant was using her job as leverage. She testified that she was terrified that Defendant had all of her personal information and might be able to find her.

**{13}**  <u>Kaitlyn Houston</u>. Ms. Houston testified for the State. She went with Ms. Osborne to meet with Defendant to discuss Ms. Osborne's test results. When they arrived at Defendant's office, Defendant separated them and took Ms. Houston to a small room. Defendant told her she was a good friend to Ms. Osborne and she would do anything to help Ms. Osborne. Defendant wanted to take Ms. Houston's blood to switch it with Ms. Osborne's blood to make Ms. Osborne's blood alcohol level lower. Defendant told Ms. Houston many times that "[y]ou're a smart girl; you have a good head on your shoulders[, y]ou want to help your friend in any way that you can." Defendant refused to take money; when Ms. Houston asked him if he was talking about sex, he would never directly answer, but he also never denied that he was talking about sex. Defendant instructed Ms. Houston not to tell Ms. Osborne about their conversation. Defendant stated, "We have an agreement" multiple times and also told Ms. Houston that "[i]t's going to be a big payment[.]"

**{14}**  Ms. Houston made a phone call to Defendant that was recorded. The conversation began with Ms. Houston asking Defendant, "So like I know you won't accept cash–would you like accept another kind of payment?" Defendant responded, "Well, yeah." Later in the conversation Ms. Houston asked, "It's like if we help you out, you'll help her out?" Defendant responded, "Yeah."

**{15}**  Ms. Houston testified that Defendant made himself clear that he was going to get something from her by telling her that they were going to come to an agreement to help Ms. Osborne. On multiple occasions Defendant mentioned the possibility of Ms. Osborne losing her job and the fact that she had just purchased a house. Ms. Houston understood that the payment for lowering Ms. Osborne's blood alcohol level was going to be sex.

**{16}**  <u>Griselda Quezada</u>. Ms. Quezada testified for the State. She worked at an airport parking lot. She met Defendant when he randomly tested her for drugs at work as a requirement of her job. After conducting the test, Defendant came back to Ms. Quezada's workplace and told her that the test was positive for cocaine. She was surprised because she did not use cocaine and she had never failed a drug test before. Ms. Quezada asked if she could be re-tested, and Defendant said she could if she would come to his office after she got off work.

**{17}**  Ms. Quezada's husband went with her to Defendant's office that evening after she finished work. Ms. Quezada and Defendant went into the office while her husband waited in the car. Defendant told her that he believed she did not do drugs and that she likely came in contact with it through her husband. Defendant told her the computer that he used to access her results was locked and she needed to come back later that week by herself. Defendant said she had a good head on her shoulders and that they could come to a mutual agreement. He added that he wondered whether, if he gave her bosses the original results, they would fire her or feel sorry for her. The conversation ended with Defendant telling Ms. Quezada to come back by herself when the business was closed. Defendant kept looking at her chest during their conversation and when Defendant stood up to leave he appeared to have an erection.

**{18}** In response to being asked how she knew Defendant wanted sex, Ms. Quezada responded, "[H]e kept staring at my chest, the erection part. He kept saying, we can come to a mutual agreement. He never once asked me for money. He asked me to come back myself when the business was closed. And that he would do—I remember he said, I'll do this, this one time for you." When asked, "When you were having the conversation [with Defendant] about the possibility that you would be fired for this, did you feel like he was using your job as leverage?" Ms. Quezada responded that she "kind of did." Her understanding was that she was supposed to have sex with Defendant in order for him to lower the levels of drugs in her drug test sample. When asked whether Defendant ever told her that if she did not have sex with him then he would do something to her, she answered, "He kept asking if I think [my employer] will feel sorry for me[.]"

**{19}** The next day Ms. Quezada told her boss what had happened that night with Defendant and then she called the police. Ultimately, it was established that the cocaine level generated in Ms. Quezada's drug test was only .73 nanograms. A level of 300 nanograms or less is considered a negative result. Thus, contrary to what Defendant told Ms. Quezada, she never had a positive drug test result.

**{20}** The jury returned a verdict of guilty on all counts: one count each of extortion and bribery with respect to Ms. Osborne and Ms. Houston, and one count of extortion with respect to Ms. Quezada.

## DISCUSSION

**Defendant's Convictions for Extortion and Bribery Are Supported by Sufficient Evidence**

### I.        Standard of Review

**{21}** "To the extent Defendant asks us to interpret our criminal statute[s], that presents a question of law which is reviewed de novo on appeal." *State v. Chavez*, 2009-NMSC-035, ¶ 10, 146 N.M. 434, 211 P.3d 891. "After reviewing the statutory standard, we apply a substantial evidence standard to review the sufficiency of the evidence at trial." *Id.* ¶ 11.

**{22}** "We review the evidence introduced at trial to determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Gipson,* 2009-NMCA-053, ¶ 4, 146 N.M. 202, 207 P.3d 1179 (internal quotation marks and citations omitted). The reviewing court "view[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. New

Mexico appellate courts will not invade the jury's province as fact-finder by "second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] its judgment for that of the jury." *State v. Lucero*, 1994-NMCA-129, ¶ 10, 118 N.M. 696, 884 P.2d 1175. "So long as a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset a jury's conclusions." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (emphasis, internal quotation marks, and citation omitted).

## II.    Extortion

### A.    Implied Threats

**{23}**    On appeal, Defendant does not dispute that the evidence demonstrated that he was trying to obtain sex from Ms. Osborne, Ms. Houston, and Ms. Quezada. Instead, Defendant contends that he did not explicitly threaten them as, he urges, must be shown to prove extortion. He characterizes his statements as "vague," and maintains that "[a] finding of extortion should only be possible based upon evidence of an explicit threat and [Defendant] never made such an explicit threat." Defendant cites to no authority requiring that a threat must be explicit in order to support an extortion conviction, and, as such, we assume none exists.[1] *See State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 (stating that given no cited authority, "[w]e assume no such authority exists").

**{24}**    "Our primary goal when interpreting statutory language is to give effect to the intent of the [L]egislature." *State v. Torres*, 2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. "We do this by giving effect to the plain meaning of the words of [the] statute, unless this leads to an absurd or unreasonable result." *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801; *see State v. McWhorter*, 2005-NMCA-133, ¶ 5, 138 N.M. 580, 124 P.3d 215 ("If the language of the statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation."). The statutory definition of extortion is broad:

> Extortion consists of the communication or transmission of *any threat* to another by *any means whatsoever* with intent thereby to wrongfully obtain anything of value or to wrongfully compel the person threatened to do or refrain from doing any act against his will.

> Any of the following acts shall be sufficient to constitute a threat under this section:

> . . . .

> C.    a threat to expose, or impute to the person threatened, or another, any deformity or disgrace;

> D.    a threat to expose any secret affecting the person threatened, or another[.]

Section 30-16-9 (emphasis added).[2] This language encompasses, for purposes of accomplishing extortion, a threat that is verbal, written, or even communicated through a person's actions. *See State v. Barber*, 1979-NMCA-137, ¶¶ 14, 18, 93 N.M. 782, 606 P.2d 192 (concluding that the defendant had threatened the victim for purposes of Section 30-16-9 when the threat was not verbally communicated but instead "result[ed] from [the] victim's reasonable fear of additional violence after he [had] been beaten").

**{25}**    "Threat," however, is not defined in the extortion statute and thus we look to the dictionary definition of the term. *See State v. Lindsey*, 2017-NMCA-048, ¶ 14, 396 P.3d 199 ("[O]ur courts often use dictionary definitions to ascertain the ordinary meaning of words that form the basis of statutory construction inquiries." (alteration, internal quotation marks, and citation omitted)). *Black's Law Dictionary* defines a "threat" as "a communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, *express or implied*, of an intent to inflict loss or pain on another[.]" *Black's Law Dictionary* 1708 (10th ed. 2014) (emphasis added); *see also State v. Fernandez*, 1994-NMCA-056, ¶ 35, 117 N.M. 673, 875 P.2d 1104 (considering the *Black's Law Dictionary* definition of "threat" in interpreting New Mexico's intimidation of a witness statute). There is no indication in the extortion statute that the Legislature meant to constrict the ordinary meaning of "threat." To the contrary, Section 30-16-9's broad language—i.e., that "[e]xtortion consists of the communication or transmission of *any threat* to another *by any means whatsoever*"—suggests the opposite. Given the unambiguous and broad language that our Legislature used to define the scope of extortion in Section 30-16-9, as well as the plain meaning of the word "threat," we conclude that extortion may be premised on an implied threat.[3]

## B.    The Evidence of Defendant's Extortionate Threats

**{26}**    <u>Antoinette Osborne</u>. Substantial evidence supports the jury's determination that Defendant extorted Ms. Osborne. Defendant told Ms. Osborne that she stuck out in his mind because she was a teacher and he knew that she did not want to lose her job. Defendant continued to mention Ms. Osborne's job, and told her that he could change her blood results because he had the power to "fix it." Defendant made clear that he could make Ms. Osbourne's results lower *or higher*. Defendant continually brought up the prospect of Ms. Osborne losing her job—"[Defendant] let [her] know [her job] was being held over [her] head." The evidence further established that Defendant was trying to compel Ms. Osborne to have sex with him.

**{27}**    Defendant argues that the information he had "was information the police or employers already had," thus suggesting that he could not have threatened to expose a secret or disgrace. We disagree. There is no evidence that Albuquerque Public Schools had any information about Ms. Osborne's blood test results at the time of Defendant's conversations with her. Moreover, as stated, Defendant told Ms. Osborne that he could

either lower *or raise* her blood test results. Law enforcement and Ms. Osborne's employer obviously did not have the elevated test results that Defendant suggested he was in a position to provide.

**{28}** The jury reasonably could have inferred that implicit in Defendant's discussion of Ms. Osborne's job and his ability to make her test results lower or higher was the threat that, if she refused to have sexual relations with him, he could report an unfavorable blood alcohol test result and she could lose her employment. *See State v. Maes*, 2007-NMCA-089, ¶ 12, 142 N.M. 276, 164 P.3d 975 ("We determine whether the evidence supports any conceivable set of rational deductions and inferences that logically leads to the finding in question." (internal quotation marks and citation omitted)). This evidence was sufficient to meet the required elements of extortion: Defendant threatened to expose or imply the existence of a disgrace—blood test results that could result in loss of her job—intending thereby to wrongfully compel Ms. Osborne to have sexual relations with Defendant.

**{29}** Kaitlyn Houston. There also was substantial evidence to support the jury's determination that Defendant extorted Ms. Houston by trying to compel her to engage in sex with him in order to help her friend, Ms. Osborne, avoid loss of her job. Defendant repeatedly raised with Ms. Houston the prospect of Ms. Osborne losing her job. Because Ms. Osborne and Ms. Houston had been discussing their dealings with Defendant, the jury could infer that Ms. Houston knew of Defendant's implied threats to report Ms. Osborne's adverse blood test results. And the jury heard testimony that Defendant intimated to Ms. Houston that she should have sex with him in order to help Ms. Osborne: "[y]ou're a smart girl. You have a good head on your shoulders[, y]ou want to help your friend in any way that you can."

**{30}** Defendant argues that Ms. Houston's "relationship to any alleged secret or disgrace [was] too attenuated." However, the extortion statute encompasses "a threat to expose, or impute to the person threatened, *or another*, any deformity or disgrace." Section 30-16-9(C) (emphasis added). The statute thus expressly contemplates a situation where the victim's relationship with another person is leveraged for exploitation. Here, the jury reasonably could determine that Defendant implicitly threatened to disclose unfavorable blood test results for Ms. Osbourne that would have adverse consequences for her career if Ms. Houston did not have sexual relations with him. *See Maes*, 2007-NMCA-089, ¶ 12. As such, there was sufficient evidence of extortion against Ms. Houston.

**{31}** Griselda Quezada. Substantial evidence also supported Defendant's conviction of extortion against Ms. Quezada. Defendant told Ms. Quezada that if he gave her bosses the original drug test results, which he falsely represented showed cocaine in her system, that he wondered if they would fire her or instead feel sorry for her. Defendant told Ms. Quezada that she had a good head on her shoulders and that they could come to a mutual agreement. However, he never once asked her for money, but requested that she return by herself when the business was closed.

**{32}** A reasonable jury could infer from this evidence that implicit in Defendant's stated concern about Ms. Quezada's job was a threat to expose her drug test results to compel her to have sexual relations with him. *See Maes*, 2007-NMCA-089, ¶ 12. This evidence was sufficient to meet the required elements of extortion: Defendant threatened to expose or imply the existence of a disgrace—Ms. Quezada's blood results that could result in loss of her job—intending to wrongfully compel Ms. Quezada to have sexual relations with Defendant.

## III.    Bribery

**{33}** Defendant challenges his bribery convictions, arguing that they, too, are not supported by substantial evidence. Since Defendant presents no challenge to the bribery statute, we review the sufficiency of the evidence against the jury instructions. *See State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 ("[J]ury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)). The jury instruction for Defendant's bribery charges stated:

> For you to find . . . Defendant guilty of acceptance of a bribe by a witness as charged in Count 2 [and in Count 4], the [s]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. [Defendant], was a witness or was likely to become a witness in any judicial, administrative, legislative or other proceeding;
>
> 2. [Defendant] did receive, agree to receive, or solicit any bribe or anything of value, a sexual act, from Antoinette Osborne [and Caitlin Houston], to testify falsely or abstain from testifying to any fact in any judicial, administrative, legislative or other proceeding.
>
> 3. This happened in New Mexico on or about 18th day of December, 2012.

**{34}** In challenging his convictions for bribery of Ms. Osborne and Ms. Houston, Defendant does not dispute that he solicited sexual acts from these women. He also does not dispute that he told Ms. Osborne that he anticipated being a witness. Instead, Defendant insists that he had never testified as anything other than a custodian of records and did not have the qualifications to give expert testimony; and he further argues that there was no evidence that he actually would, or likely would, have become a witness. Defendant's argument thus focuses on the first element of the crime as charged—that Defendant *was or likely would become* a witness.

**{35}** Ms. Osborne testified that Defendant told her that he anticipated being a witness in her case:

> Q.       Now, did he tell you that he anticipated being a witness in your case?

A. Yes.

Q. How did he do that?

A. He said that if my lawyer wanted to use the results that he would have to come to, I guess—not the trial, but to court for me. And so that's why there could be no money exchanged, because if they asked him in court, he wouldn't be able to—he wouldn't want to lie and say that I had given him money.

Elsewhere in her testimony Ms. Osborne explained that, in response to her question about how she would pay Defendant for lowering her blood test scores, he told her that he could not take money because that would be a bribe and "would look very bad in court."

{36}  Defendant did not tell Ms. Osborne that he would be an expert as opposed to a lay witness. And the jury instruction did not require Defendant to be an expert witness. Because Defendant came to the jail the night of Ms. Osborne's arrest for the purpose of conducting an independent blood test, the jury could determine that he was at a minimum a potential witness to testify about the chain of custody for the independent blood test. We will not invade the jury's province as fact-finder, *see State v. Lucero*, 1994-NMCA-129, ¶ 10, 118 N.M. 696, 884 P.2d 1175, and instead we "defer to the jury's evaluation of the evidence," *see Maes*, 2007-NMCA-089, ¶ 12. We therefore conclude that substantial evidence supported Defendant's convictions for bribery.

**Defendant's Convictions for Both Bribery and Extortion Do Not Violate His Double Jeopardy Rights and Are Not Mutually Exclusive**

**I.      Double Jeopardy**

{37}  Defendant challenges his convictions for both extortion and bribery on the ground that they violate his right under the Fifth Amendment to the United States Constitution to not be put in jeopardy twice for the same offense. We generally apply a de novo standard of review to the constitutional question of whether there has been a double jeopardy violation. *See State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77.

{38}  The Double Jeopardy Clause protects against, among other kinds of harm, "multiple punishments for the same offense." *State v. Montoya*, 2013-NMSC-020, ¶ 23, 306 P.3d 426. The double jeopardy prohibition against multiple punishments, on which Defendant relies, is implicated when a defendant is charged with violations of multiple statutes for the same conduct, referred to as "double[]description" cases. *See State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61.

{39}  For "double[]description" cases, we apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223: (1) whether the conduct is unitary and (2) if so, whether the Legislature intended to punish the offenses separately.

*See State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616. "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the [D]ouble [J]eopardy [C]lause prohibit multiple punishment in the same trial." *Id.* (internal quotation marks and citation omitted)).

## A.      Unitary Conduct

**{40}**    Defendant argues that his convictions for bribery and extortion are based on unitary conduct—Defendant's "vague statements" showing that he was interested in sex with Ms. Osborne and Ms. Houston and that he might be able to do something favorable with Ms. Osborne's test results. We are not persuaded.

**{41}**    Conduct is not unitary if "examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Swafford*, 1991-NMSC-043, ¶ 29. "When determining whether [a d]efendant's conduct was unitary, we consider whether [his or her] acts are separated by sufficient indicia of distinctness." *DeGraff*, 2006-NMSC-011, ¶ 27 (internal quotation marks and citation omitted).

> If two events are sufficiently separated by either time or space (in the sense of physical distance between the places where the acts occurred), then it is a fairly simple task to distinguish the acts. Time and space considerations, however, cannot resolve every case and resort must be had to the quality and nature of the acts or to the objects and results involved.

*Swafford*, 1991-NMSC-043, ¶ 28. "Conduct is separate and distinct and not unitary if events are sufficiently separated by either time or space, *or* the quality and nature of the acts or the objects and results involved are distinguishable[.]" *State v. Contreras*, 1995-NMSC-056, ¶ 14, 120 N.M. 486, 903 P.2d 228 (emphasis added) (omission, internal quotation marks, and citation omitted); *accord State v. Livernois*, 1997-NMSC-019, ¶ 20, 123 N.M. 128, 934 P.2d 1057. *But cf. Silvas*, 2015-NMSC-006, ¶ 10 ("Conduct is unitary when not sufficiently separated by time or place, *and* the object and result or quality and nature of the acts cannot be distinguished." (emphasis added)).

**{42}**    While the objective, sexual gratification, was the same, Defendant's bribery and extortion crimes were differentiated by their means, that is, the quality and nature of the acts. Defendant bribed Ms. Osborne and Ms. Houston by proposing to generate and testify about more favorable test results in exchange for their agreement to engage in sex with him. Defendant extorted Ms. Osborne and Ms. Houston by threatening unmodified—or even higher and thus less favorable—test results that would place Ms. Osborne's employment at risk.

**{43}**    This distinction between the two crimes is reflected in the prosecutor's closing argument. In arguing the grounds for convicting Defendant of extortion, he urged that "[Defendant] had tried to get her to do something [Ms. Osborne] wouldn't have done, and he used her job as leverage." He further stated:

I'm going to specifically talk about extortion right now—[Defendant] called it tricks—if anyone is gaining information from these women and using it against them. Ms. Osborne told you that she was a teacher and she was worried about her job. He used it to play on her emotions, to threaten her with a higher blood score that she could lose [her] job. It's consistent throughout these transcripts to get her to have sex with him. . . .

He did the same thing with Ms. Houston, playing on the friend, that her friend could lose her job, to get her to have sex with him[.]

On the bribery count, the prosecutor stated, "[h]ow is the defendant going to abstain from testifying to any fact? . . . He[ is] going to testify to the lower [test result]." The prosecutor further stated, "[Defendant was] telling these women that he's going to testify for them, how do we know that? He said, 'this will look bad.' I don't want to be in a position where I'm asked [in court] if you paid for these results."

**{44}** Defendant thus committed the bribery with a carrot—an offer to provide testimony about favorable test results—and the extortion with a stick—a threat to disclose unmodified or unfavorable test results. The fact that these tactics were employed in the same or related conversations does not blur or otherwise diminish their distinct natures. Thus, the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses. We therefore conclude that Defendant's criminal conduct was not unitary.

## B.     Legislative Intent

**{45}** We acknowledge that Defendant's statements which were the basis for his extortion and bribery convictions may have been uttered during the same conversations, and thus may not have been materially separated in time and space. But even if we assume unitary conduct, *see, e.g.*, *State v. Franco*, 2005-NMSC-013, ¶ 11, 137 N.M. 447, 112 P.3d 1104 ("[B]ecause we presume the conduct was unitary, we proceed to the second part of the *Swafford* analysis to determine whether the Legislature intended to allow multiple punishments based on the facts and circumstances of this case."), we conclude our Legislature intended to punish the crimes of extortion and bribery separately and thus Defendant does not satisfy the second prong of the *Swafford* test.

**{46}** In analyzing legislative intent in the double jeopardy context, our Supreme Court has stated:

[W]e first look to the language of the statute itself. If the statute does not clearly prescribe multiple punishments, then the rule of statutory construction established in *Blockburger v. United States*, 284 U.S. 299 . . . (1932) applies.

Under *Blockburger*, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which

the other does not. If the statute is vague and unspecific, or written in the alternative, courts must consider the [s]tate's legal theory in assessing whether each provision requires proof of a fact which the other does not.

If each statute requires proof of a fact that the other does not, it may be inferred that the Legislature intended to authorize separate punishments under each statute. However, this is only an inference that leads to an examination of other indicia of legislative intent.

*State v. Swick*, 2012-NMSC-018, ¶¶ 11-13, 279 P.3d 747 (internal quotation marks and citations omitted).

**{47}** Guided by this analytical framework, we note first that New Mexico's extortion and bribery by witness statutes, Sections 30-16-9 and 30-24-3.1, respectively, do not clearly prescribe multiple punishments. *Cf. State v. Gutierrez*, 2011-NMSC-024, ¶¶ 55, 55 n.2, 150 N.M. 232, 258 P.3d 1024 (noting that statutes prohibiting armed robbery and unlawful taking of vehicle do not expressly provide for multiple punishments, while statute dealing with various forms of credit card crimes does so provide).

**{48}** Second, manifestly, Sections 30-16-9 and 30-24-3.1 each requires proof of a fact—indeed, multiple facts—that the other does not. Extortion requires (1) a threat communicated (2) with the intent to obtain anything of value or to compel the victim to do something that she otherwise would not have done. Section 30-16-9. Bribery by witness requires that a person (1) who is or is likely to become a witness (2) receives, agrees to receive or solicits a bribe or anything of value (3) to testify falsely, or abstain from testifying in a legal proceeding or abstain from reporting to the government information regarding a crime. Section 30-24-3.1.

**{49}** Third, we note that both statutes are written in the alternative. Defendant was charged with extortion under Section 30-16-9(C) and (D), which specify that the subject threats are "to expose, or impute to the person threatened, or another, any deformity or disgrace" or "to expose any secret affecting the person threatened, or another[,]" respectively. He was charged with bribery of a witness under Section 30-24-3.1(A)(1), which specifies that the quid pro quo for the bribe is "to testify falsely or to abstain from testifying to any fact" in any legal proceeding. Thus, we must consider the State's legal theory and not just the elements of the crime as set forth in the statute. Under the State's legal theory as reflected in the jury instructions, it remains clear that each charge required proof of facts that the other did not. To prove extortion, the State had to establish that Defendant made threats to expose a secret or disgrace of the victims and thereby compel them to do something—engage in sex with him—that they otherwise would not have done. To prove bribery, the State had to establish that Defendant was or was likely to be a witness, and he solicited sexual acts from them in exchange for testifying falsely or abstaining from testifying in a legal proceeding.

**{50}** Fourth, we look to other indicia that sheds light on whether the Legislature intended to punish these crimes separately.

> Statutes directed toward protecting different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments. . . . If several statutes are not only usually violated together, but also seem designed to protect the same social interest, the inference becomes strong that the function of the multiple statutes is only to allow alternative means of prosecution.

*Swafford*, 1991-NMSC-043, ¶ 32. The intent that underlies Sections 30-16-9(C) and (D), the extortion statute, is directed at protecting citizens from coercion, in particular, from being forced to give up something of value or take action out of fear that a disgrace, deformity, or secret will be disclosed. In contrast, the intent of Section 30-24-3.1(A)(1) is directed at protecting the integrity of judicial and other legal proceedings. The statutes are not necessarily violated together and are not designed to protect the same social interest.

## C.    Conclusion

**{51}**    The conduct that formed the basis for Defendant's extortion and bribery convictions was not unitary, and the Legislature intended to punish the offenses separately. We therefore hold that Defendant was not put in jeopardy for the same offense when he was convicted of both crimes.

## II.    Mutual Exclusivity

**{52}**    Defendant argues that extortion and bribery are mutually exclusive and therefore his convictions of both crimes cannot stand. We disagree.

**{53}**    Defendant relies on *State v. Hornbeck*, 2008-NMCA-039, 143 N.M. 562, 178 P.3d 847. Importantly, in *Hornbeck*, the defendant was convicted of fraud and embezzlement based on the same act: the victim's delivery of a substantial sum of money to the defendant. *Id.* ¶¶ 3, 5. This Court concluded that the defendant's convictions could not stand because the fraud and embezzlement crimes were mutually exclusive. *Id.* ¶ 15. The two convictions were "fatally inconsistent" with one another, because a finding of guilt on the fraud charge—that the property was acquired unlawfully—negated an essential fact necessary to the finding of guilt on the embezzlement charge—that the property was acquired lawfully and then later unlawfully converted. *Id.* ¶¶ 12, 15. The same conclusion is not compelled here.

**{54}**    Defendant argues that the jury was required to find an agreement between himself and Ms. Osborne and Ms. Houston in order to convict him of bribery. Defendant argues that such a finding is inconsistent with the jury's necessary finding with respect to his extortion convictions that he threatened Ms. Osborne and Ms. Houston. Under the jury instructions relating to bribery, however, the jury was permitted to reach a finding of guilt if "[Defendant] did receive, agree to receive, *or solicit any bribe* or anything of value, a sexual act, from [victims], to testify falsely or abstain from testifying[.]" (Emphasis added.) The jury consequently needed only make a finding that Defendant solicited a bribe in order to convict on this count. Such a finding is in no way

inconsistent with a finding of guilt on the extortion charge, and as discussed above, there was substantial evidence upon which to convict Defendant of both extortion and bribery. We therefore conclude that under the facts of this case, Defendant's bribery and extortion convictions are not mutually exclusive.

**CONCLUSION**

**{55}** We affirm Defendant's convictions for bribery and extortion.

**{56} IT IS SO ORDERED.**

**HENRY M. BOHNHOFF, Judge Pro Tempore**

**I CONCUR:**

**M. MONICA ZAMORA , Chief Judge**

**JENNIFER L. ATTREP, specially concurring.**

**SPECIALLY CONCURRING OPINION**

**ATTREP, J., specially concurring.**

**{57}** I concur with the result of today's opinion, but write separately as I do not agree with the majority's conclusion that the conduct in this case is non-unitary.

**{58}** The majority concedes that the acts supporting Defendant's bribery and extortion convictions were not separated by time, space, object, or motive. *See Swafford*, 1991-NMSC-043, ¶ 28. The majority, instead, attempts to differentiate Defendant's conduct by quality and nature. Without identifying what independent factual bases supported Defendant's extortion and bribery convictions, the majority asserts ipse dixit that because Defendant stated both that he could increase or decrease Ms. Osborne's blood alcohol score, there is sufficient distinction between Defendant's extortionate threats and use of bribes to conclude that the conduct here was non-unitary. An examination of the record, however, reveals that Defendant simultaneously discussed increasing and decreasing Ms. Osborne's score—in other words, Defendant's tactics were intermingled, intertwined, and largely indistinguishable. And the majority has identified no demarcation in the record between Defendant's use of a "stick" (a higher or unmodified score) as opposed to a "carrot" (a lower score), nor have I found one. *See State v. Sanchez*, 1996-NMCA-089, ¶ 9, 122 N.M. 280, 923 P.2d 1165 (noting that "[b]efore . . . resolv[ing] the question of double jeopardy, [the reviewing court] first [should] engage[] in an exhaustive review of the facts presented at trial to determine whether the conduct was unitary"); *see also State v. Saiz*, 2008-NMSC-048, ¶ 34, 144 N.M. 663, 191 P.3d 521 (concluding that after "[l]ooking at the totality of the evidence related to the two separate crimes, it was altogether reasonable for the jury to conclude that [the d]efendant had first" committed kidnapping before slaying his victim),

*abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783. Moreover, the majority cites to no case in which intermingled conduct like Defendant's has been held to be non-unitary. Notably, we have in the past held that where the object of a defendant's actions are the same, his conduct is unitary even where there is a much clearer differentiation of the means used by the defendant than is present in this case. *See State v. LeFebre*, 2001-NMCA-009, ¶ 18, 130 N.M. 130, 19 P.3d 825 (determining that the defendant's actions were unitary where the defendant had a singular purpose to evade officers, even though he evaded officers in two distinct ways—by automobile and on foot).

**{59}** On the record before us today, I do not believe there is a "basis for determining that Defendant's conduct was not unitary." *State v. Caldwell*, 2008-NMCA-049, ¶ 9, 143 N.M. 792, 182 P.3d 775. As such, I respectfully disagree with the majority's conclusion to the contrary. Nonetheless, because I agree with the majority's evaluation of the second element of *Swafford's* double description analysis, I concur in the majority's ultimate conclusion that there is no double jeopardy violation in this case.

**JENNIFER L. ATTREP, Judge**

---

[1]In reply, Defendant seems to retreat from his unsupported contention that extortionate threats must be explicit, stating instead that "the threat *should* be explicit. There may be cases where the threat is implied, but in those cases, the threat should be clear."

[2]The jury was instructed consistently with this statutory definition. In relevant part, the jury was instructed that the State must prove beyond a reasonable doubt that Defendant threatened to expose or imply the existence of a disgrace or to expose a secret of one of the victims or another intending to wrongfully compel one of the victims to do something she otherwise would not have done.

[3]Defendant contends without citation to authority that in other jurisdictions statutory extortion is a lesser crime than robbery. He urges that, because our Legislature has made robbery and extortion equivalent crimes—that is, both are third degree felonies— New Mexico equates extortion to a crime of violence and, as such, the threat that underlies extortion "should be something more clear and unambiguous than suggestions that make the alleged victim feel nervous." Rather than considering the severity of the punishment for the crime in question in construing a statute to determine the legislature's will, see 2A Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction, § 46:3, at 188 (7th ed. rev. 2014), we look primarily to the statute's plain language. See McWhorter, 2005-NMCA-133, ¶ 5 ("If the language of the statute is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation."). But see State v. Chavez, 2009-NMSC-035, ¶¶ 15-16, 146 N.M. 434, 211 P.3d 891 (considering the severity of the crime in construing the words "may endanger" in child endangerment statute (internal quotation marks

omitted)). Here, the unambiguous language that our Legislature used to define the scope of extortion—"the communication or transmission of any threat to another by any means whatsoever"—leads us to conclude, as already stated, that extortion may be premised on an implied threat.